950 A.2d 294

**COMMONWEALTH of Pennsylvania, Appellee/Cross–Appellant**

v.

**Kenneth J. WILLIAMS, Appellant/Cross–Appellee.**

Supreme Court of Pennsylvania.

Resubmitted Nov. 29, 2006.

Decided June 17, 2008.

110

Michael Wiseman, Esq., Philadelphia, for Kenneth J. Williams (430 CAP).

Joan L. Reinsmith, Esq., James Bernard Martin, Esq., Amy Zapp, Esq., for Commonwealth of Pennsylvania (430 CAP).

Joan L. Reinsmith, Esq., James Bernard Martin, Esq., Amy Zapp, Esq., for Commonwealth of Pennsylvania (431 CAP).

Michael Wiseman, Esq., Philadelphia, for Kenneth J. Williams (431 CAP).

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice SAYLOR.[1]

In these consolidated capital post-conviction cross-appeals, the designated appellant, Kenneth J. Williams, challenges the denial of relief from his convictions for first-degree murder and related offenses, and the Commonwealth seeks to overturn the award of a new penalty hearing.

The factual circumstances underlying Appellant's judgments of sentence are set forth in *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994). Briefly, Appellant shot and killed the victim, truck driver Edward Miller, on or around October

---

1. This case was reassigned to this author.

20, 1983, in the trailer portion of the victim's rig while stopped alongside the Pennsylvania Turnpike. The police investigation centered on Appellant upon the discovery of his possession and use of Mr. Miller's credit cards as Appellant traveled with another trucker, Monica Manion. Ms. Manion related to police that: Appellant was driving Mr. Miller's rig in a time-frame near the time of the victim's death as determined by a medical examiner; Appellant parked the trailer at a truck stop in Kuhnsville in the location where the victim's body was later discovered; and Appellant gave her a flashlight belonging to the victim. Upon his apprehension, Appellant confessed to having shot Mr. Miller in the back and to having taken his rig and various items of his personal property. The Commonwealth charged Appellant, *inter alia*, with criminal homicide and robbery and furnished notice of its intent to seek the death penalty.

At the pre-trial stage, Appellant was represented by then-Chief Lehigh County Public Defender Frederick E. Charles, Esquire. Attorney Charles was permitted to withdraw, however, in light of an asserted conflict of interest arising from Appellant's complaints lodged against him relative to the representation. Initially, Attorney Charles was replaced by other members of his office. He maintained, however, that the conflict was shared by his staff, a matter which he ultimately raised before this Court. Then–Chief Justice Nix convened a conference with Attorney Charles, the two appointed assistant public defenders, and the district attorney, and he directed the attorneys to convey to the trial judge his suggestion that the judge should reconsider his order requiring the assistant public defenders to represent Appellant. The attorneys complied, and the trial court appointed new counsel, Charles Sieger, subject to a $3,500 fee cap and, apparently, a $500 limitation on available reimbursement for investigative services.[2] The trial court also rescheduled trial, which commenced twenty-two days later.

2. The limitation on reimbursement for investigative services derives from trial counsel's post-conviction testimony, in which he asserts that he approached the trial judge informally to ask for funds and was told

At trial, the Commonwealth introduced Appellant's confession and testimony from various witnesses, including Ms. Manion, tracing Appellant's movements prior and subsequent to the date of the killing. The Commonwealth also offered evidence demonstrating that Appellant was familiar with handguns, including .38 caliber pistols such as that used in the killing of Mr. Miller, and that he had access to such weapons. Appellant testified in his defense, admitting to having taken possession of the victim's tractor-trailer and credit cards, but indicating that his confession was falsely given on account of threats directed toward his intimates by a personal adversary. He also presented an alibi defense, claiming that Mr. Miller was killed while he was traveling west in Ms. Manion's company.

In addition to the first-degree murder conviction, Appellant was found guilty of robbery and related offenses. The death sentence followed, upon the jury's finding of one aggravating circumstance, namely, that the defendant killed the victim while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), which outweighed the mitigation found by at least one juror under the catch-all factor, 42 Pa.C.S. § 9711(e)(8).

Attorney Sieger withdrew from the representation and substitute counsel was appointed. Post-verdict motions were filed and denied. A further substitution of counsel occurred; Appellant filed a direct appeal; and this Court affirmed the conviction and sentence. *See Williams*, 537 Pa. at 31, 640 A.2d at 1266.

Appellant commenced post-conviction proceedings in state and federal court, and, after protracted litigation including a limited evidentiary hearing, this Court directed the PCRA court to proceed to resolve the petition before it on the merits. *See Commonwealth v. Williams*, 573 Pa. 613, 828 A.2d 981 (2003). Among the claims asserted were allegations that: former Chief Justice Nix improperly interfered with the appointment of Appellant's trial counsel and with the estab-

of the $500 restriction. *See* N.T., May 17, 2000, at 11, 21–22. The fact of the restriction is not disputed by the Commonwealth.

lishment of his trial date, thereby creating a structural error; by setting an assertedly unreasonable trial date, the trial court created conditions under which Appellant was denied counsel at a critical stage and/or trial counsel rendered ineffective assistance by failing to secure a continuance; trial counsel was ineffective for failing to consult with and retain experts to rebut the prosecutor's presentation of false evidence; Appellant was denied his right to a meaningful appeal since there was no transcript from a pre-trial suppression hearing; the trial court erred in admitting evidence of Appellant's ownership and alleged theft of firearms which were unconnected with the case; there was insufficient evidence to support the conviction for robbery and, correspondingly, the in-perpetration-of-a-felony aggravating factor; the trial court erroneously excluded relevant mitigation evidence in the form of expert testimony concerning a lack of future dangerousness on Appellant's part; and trial counsel rendered ineffective assistance in the penalty phase by failing to investigate and present available mitigation evidence. Appellant also included various assertions of deficient stewardship on the part of all his prior counsel in an effort to overcome any potential waiver of his claims. *See generally Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003) (discussing the waiver of claims not asserted at the first available opportunity and the advancement of derivative claims of deficient stewardship).[3]

---

**3.** To obtain relief on a claim of ineffective assistance of counsel, a petitioner must demonstrate that the underlying claim is of arguable merit, no reasonable basis existed for counsel's action or inaction, and counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *See Commonwealth v. Pierce*, 567 Pa. 186, 203, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball*, 555 Pa. 299, 312, 724 A.2d 326, 333 (1999); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (explaining that, to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). Counsel is presumed to have rendered effective assistance, *see Commonwealth v. Basemore*, 560 Pa. 258, 277 n. 10, 744 A.2d 717, 728 n. 10 (2000) (citing *Commonwealth v. Copenhefer*, 553 Pa. 285, 301, 719 A.2d 242, 250 (1998)), and, if the petitioner fails to satisfy any prong of the ineffectiveness inquiry, his claim will be rejected. *See Commonwealth v. Malloy*, 579 Pa. 425, 448, 856 A.2d 767, 781 (2004) (citing *Pierce*, 567 Pa. at 217, 786 A.2d at 221–22).

The PCRA court subsequently issued an opinion denying relief on all guilt-phase claims. However, the court awarded a new penalty hearing upon a finding of ineffective assistance of counsel in the investigation and presentation of mitigating evidence, and error on the part of the trial court in prohibiting the presentation of defense expert testimony concerning a lack of future dangerousness on Appellant's part. *See Commonwealth v. Williams*, No. 981/1984, *slip op.* (C.P. Lehigh Oct. 17, 2003).

Both Appellant and the Commonwealth filed appeals. Initially, we remanded, because the PCRA court's opinion supporting the award of sentencing relief was couched solely in terms of waived claims. The PCRA court conducted an evidentiary hearing to permit Appellant an opportunity to further develop the derivative, non-waived claims, and it subsequently reinstated its award of sentencing relief, as authorized by our remand Order. *See Commonwealth v. Williams*, No. 981/1984, *slip op.* (C.P. Lehigh Oct. 3, 2006). Supplemental briefs were filed by both parties, and the matter is now ripe for our review.

In addressing the grant or denial of post-conviction relief, an appellate court will consider whether the PCRA court's conclusions are supported by record evidence and are free of legal error. *See Commonwealth v. Jones*, 590 Pa. 202, 216, 912 A.2d 268, 276 (2006) (citing *Commonwealth v. Travaglia*, 541 Pa. 108, 117 n. 4, 661 A.2d 352, 356 n. 4 (1995)). The level of deference accorded to the post-conviction court may vary depending upon whether the decision involved matters of credibility or matters of applying the governing law to the facts as so determined. *See Commonwealth v. Reaves*, 592 Pa. 134, 142, 923 A.2d 1119, 1124 (2007).

As indicated, and consistent with the eligibility requirements for PCRA relief, Appellant frames his claims as involving violations of the United States or Pennsylvania Constitutions, including the denial of effective assistance of counsel. *See* 42 Pa.C.S. § 9543(a)(2)(i, ii). As also noted, to prevail on his allegations of deficient stewardship, Appellant must dem-

onstrate that the underlying claim is of arguable merit; that no reasonable strategic basis existed for counsel's act or omission; and that counsel's error resulted in prejudice, or, in other words, there is a reasonable probability that the outcome would have been different. *See supra* note 3. In addition, Appellant is required to establish that his claims have not been waived or previously litigated. *See* 42 Pa.C.S. § 9543(a)(3). As to waiver, since Appellant was represented by new counsel at the post-verdict stage and on direct appeal, his claims of ineffective assistance of trial counsel that were not raised at that time are waived, and the only extant ineffectiveness claims are derivative ones challenging appellate counsel's performance relative to the underlying ineffectiveness claims. *See McGill*, 574 Pa. at 586, 832 A.2d at 1021–22. While in a number of instances, our review entails evaluation of the potential merits of waived underlying claims, such assessment is employed solely as a means of determining the viability of extant derivative claims. *See id.* at 591–92, 832 A.2d at 1024–25 (explaining that a layered claim cannot be sustained where the underlying claim is unmeritorious). As to previous litigation, this Court modified the applicable standard in *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005), which holds that layered ineffectiveness claims are to be regarded, on collateral review, as distinct from the underlying claims. *See id.* at 60–61, 888 A.2d at 573.

## I. Sentencing Relief

█ The PCRA court based its determination that Appellant's trial counsel was ineffective at the sentencing phase on the attorney's failure adequately to investigate and present available evidence concerning Appellant's mental-health condition.[4] Initially, the court observed that trial counsel had

4. The PCRA court, however, agreed with the Commonwealth that counsel performed adequately in the presentation of life-history mitigation. The court observed that counsel introduced evidence about Appellant's upbringing, highlighting that Appellant himself testified fairly extensively about his youth. While taking into account that there were some qualitative and quantitative differences between the life-history adduced at trial and in the post-conviction proceedings, the court nevertheless concluded that Appellant's upbringing was not so

constructive notice of the potential relevance of mental-health issues, since his predecessor had filed a notice of intent to assert an insanity defense, referencing Appellant's two psychiatric hospitalizations (voluntary and involuntary) four and seven months prior to his offenses. Further, the court found that, had trial counsel investigated, he would have learned that Appellant had been diagnosed with adjustment disorder, depression, and dysthymic disorder upon his commitment. *See Williams*, No. 981/1984, *slip op.* at 35–39 (10/17/03) (citing *Commonwealth v. Smith*, 544 Pa. 219, 245, 675 A.2d 1221, 1234 (1996) (plurality) (indicating that, "where counsel is informed that his client has suffered some mental health problems that may provide evidence of mitigation in the penalty phase, counsel is ineffective if he fails to pursue such evidence.")). The court also noted that Appellant's post-conviction mental-health expert rendered a diagnosis of post-traumatic stress disorder, which was consistent with the prior diagnoses. Based upon this evidence, the PCRA court concluded that there was a reasonable probability that, had the diagnosis of post-traumatic stress disorder and/or the evidence of the multiple disorders discerned upon Appellant's psychiatric commitments been presented to the jurors, the mitigating factor under Section 9711(e)(2) of the Judicial Code, 42 Pa.C.S. § 9711(e)(2), would have been found by at least one juror. *See Williams*, No. 981/1984, *slip op.* at 38 (10/17/03). Particularly as there was only one aggravating circumstance, the court also concluded that there was a reasonable likelihood that the mental-health evidence would have offset the aggravator in the weighing process as undertaken by the individual jurors. *See* 42 Pa.C.S. § 9711(c)(1)(iv).

The PCRA court acknowledged the Commonwealth's argument that the diagnosis of post-traumatic stress disorder was unreliable because, in various accounts, Appellant had embellished upon his service in Vietnam. The court reasoned, however,

dysfunctional as to demonstrate a reasonable probability that additional testimony would have affected the outcome of the sentencing proceedings. *See Williams*, No. 981/1984, *slip op.* at 36 (10/17/03).

it is undisputed that [Appellant] was in active combat in Vietnam. Furthermore, the diagnosis was partially based upon eyewitness descriptions from family members and prison officials of certain characteristics and actions of [Appellant] which were consistent with symptoms of PTSD. It is also undisputed that [Appellant] was committed to a psychiatric hospital twice in the months shortly before the homicide. This suggests a serious mental disturbance, whether or not he was actually suffering from PTSD, and this would have been reasonably likely to constitute a mitigating factor for the jury.

PCRA Court Opinion at 38.

In its supplemental opinion, per our remand Order, the PCRA court addressed the stewardship of post-verdict and appellate counsel, finding deficiencies on the part of both attorneys. Initially, the court noted that post-verdict counsel had raised the relevant claim of ineffectiveness on the part of Appellant's trial counsel, but the attorney had failed to develop it in sufficient detail to state a claim under prevailing law. In this regard, the PCRA court explained that case law provided that assertions of ineffective assistance required an offer of proof. *See Williams,* No. 981/1984, *slip op.* at 5 (10/3/06) (citing *Commonwealth v. Durst,* 522 Pa. 2, 5, 559 A.2d 504, 505 (1989)). Since there was no such offer, or any explanation for counsel's apparent failure to secure an expert evaluation of Appellant's mental health, the court discerned a "simple failure to do what counsel was obliged to do in order to raise this issue properly." *Id.* The PCRA court also concluded that appellate counsel was similarly ineffective, based upon his own failure to present such a proffer, or to assert ineffectiveness on the part of post-verdict counsel. *See id.* at 7–8.

Presently, the Commonwealth contends that adequate evidence concerning Appellant's mental health was, in fact, presented to the jury, and that it is not clear that there is a reasonable probability that the outcome would have been different if the additional evidence referenced by the PCRA court had been introduced. The Commonwealth explains that

the evidence actually admitted at the penalty phase of Appellant's trial:

> presented the jury with a picture of a man who had earned a reputation among prison employees and professionals as a kind, caring, responsible and respected individual; an individual who had been abandoned by his parents to live in an orphanage and who grew up without the love of a family, yet, despite this pathetic upbringing, went on to become a highly decorated war hero who selflessly saved lives in combat; an individual who was a devoted and loving husband and father who fell victim to the ravages of alcohol, causing him to lose the most important people in his life.

Brief for Appellee at 58. The Commonwealth notes that a clinical psychologist, Edward R. Dubin, M.A., and a prison counselor testified in the penalty-phase proceedings, and neither indicated that Appellant suffered from serious mental-health problems. Further, the Commonwealth challenges the opinion of Appellant's post-conviction expert witness, Harry Krop, Ph.D, asserting that such opinion was dependent upon falsehoods conveyed by Appellant, including substantially embellished accounts of his war experience. The Commonwealth emphasizes that, at one point in his testimony, Dr. Krop indicated that he would revisit his diagnosis of post-traumatic stress disorder if it were determined that Appellant, in fact, did not experience atrocities which he reported. Additionally, the Commonwealth argues that the additional mental-health evidence would have been counterproductive, because Appellant's mental-health records contain evidence that he was perceived as an impulsive, irrational, violent, manipulative, and dangerous individual. In particular, the Commonwealth notes that various of the documents indicate that Appellant had beaten his girlfriend and threatened her with a sawed-off shotgun.

Appellant, on the other hand, argues that the PCRA court's findings are amply supported by the record. Initially, he develops that trial counsel did not commence preparations for the penalty phase until after the convictions at the guilt phase and immediately before the commencement of the sentencing

proceedings. *See* N.T., May 17, 2000, at 45. Further, despite counsel's awareness of the two recent psychiatric hospitalizations, as well as an account of unpredictable and psychotic behavior on his client's part, *see* N.T., May 17, 2000, at 34–35, counsel did not request Appellant's complete medical records or arrange for him to be examined by a mental-health professional. Appellant references *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), for the proposition that capital counsel has an obligation to thoroughly investigate and prepare mental health and other mitigating evidence, *see id.* at 396, 120 S.Ct. at 1514–15, and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), to support the understanding that counsel cannot meet the above requirement by relying upon only "rudimentary knowledge of [a capital defendant's] history [acquired] from a narrow set of sources," *id.* at 524, 123 S.Ct. at 2537. Appellant observes that no reasonable strategy would support a truncated investigation in the circumstances; indeed, he notes that trial counsel himself confirmed the appropriate approach to the records of Appellant's hospitalizations. *See* N.T., May 15, 2000, at 39 (reflecting counsel's comment that, had he possessed a portion of the records from of one of the hospitalizations, "I certainly would have given the whole doggone page to a mental health professional and said, what's up?"). According to Appellant, a review of the existing records would have disclosed the noted conditions and an obviously problematic prognosis, as well as recommendations for intensive mental-health intervention which never ensued.

Appellant couches the records and post-conviction evidence as portraying a man overcome by psychological stressors and mental illness, which facilitated a loss of control over his life in the weeks leading up to the killing of Mr. Miller. Viewed in this light, Appellant asserts that the mental-health evidence would have demonstrated to the jurors how Appellant's condition impacted his behavior in a way that was critically relevant to his moral culpability. Further, Appellant argues that counsel did not appreciate the significance of the partial information that he had received in terms of mitigation, or demon-

strate even a working knowledge of the mental-health terminology within the documents.[5] Finally, Appellant emphasizes Dr. Krop's testimony that the post-traumatic stress disorder, together with (or subsuming) the depression and alcohol use, constituted a serious emotional disturbance at the time of Appellant's offenses, *see* N.T., May 17, 2000, at 83. *See* 42 Pa.C.S. § 9711(e)(2) (establishing the mitigating circumstance that "[t]he defendant was under the influence of extreme mental or emotional disturbance"). In this regard, Appellant explains that, even if the jury had fully credited the penalty-phase evidence concerning his good character, such testimony did nothing to contextualize Appellant's conduct or mitigate his moral culpability relative to the crime itself, as the prosecutor himself took the opportunity to point out in his closing arguments. *See* N.T., October 4, 1985, at 145–147.

Appellant also asserts that the Commonwealth's portrayal of the evidence adduced at the penalty phase of trial is inaccurate. Acknowledging that a prison psychologist and a counselor testified at the sentencing hearing, Appellant develops that neither was ever asked to conduct a mitigation evaluation; rather, such witnesses offered only brief and general character testimony. *See* N.T., October 4, 1985, at 39–45, 57–61. Indeed, Appellant notes that the witnesses were told nothing about the facts of the case, a circumstance which the district attorney also used to substantial advantage. *See* N.T., October 4, 1985, at 48; *id.* at 145–146 (reflecting the prosecutor's argument that witnesses only knew Appellant in prison, did not know the facts of the case, and could not fully assess his character). Additionally, Appellant contends that, in focusing on his embellishments concerning his war record to attack Dr. Krop's opinion, the Commonwealth misstates the basis for the opinion as credited by the PCRA court. In this regard, Appellant develops that Dr. Krop: recognized that the various events which Appellant had reported could not be verified; noted that there were numerous independent reports

---

**5.** *See, e.g.,* N.T., May 17, 2000, at 26–30 (reflecting trial counsel's negative response and explanation that "I'm not a psychiatrist or psychologist," upon inquiries concerning references to diagnoses of Appellant's mental-health conditions).

that Appellant had symptoms of post-traumatic stress disor-
der; and testified that "there's enough documented informa-
tion both in the military records and certainly [the military
historian's] analysis of those records to suggest that it's very
likely that [Appellant] was exposed to the kinds of things that
do lead to PTSD," *id.* at 96; *see also id.* at 64, 91–92.

Finally, with regard to the stewardship of his post-verdict
and appellate counsel, Appellant advances the reasoning devel-
oped by the PCRA court.

 Upon consideration of the above, we conclude that
the PCRA court's findings are supported by the evidence and
free from legal error. Under prevailing constitutional norms
as explicated by the United States Supreme Court, capital
counsel has an obligation to pursue all reasonable avenues for
developing mitigating evidence. *See, e.g., Wiggins,* 539 U.S. at
521, 123 S.Ct. at 2535; *see also Williams,* 529 U.S. at 396, 120
S.Ct. at 1515.[6] Counsel must conduct a thorough pre-trial
investigation, *see Williams,* 529 U.S. at 396, 120 S.Ct. at 1514–
15 (citing ABA STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980)),
or make reasonable decisions rendering particular investiga-
tions unnecessary. *See Strickland,* 466 U.S. at 691, 104 S.Ct.
at 2066. Strategic choices made following a less than com-
plete investigation are reasonable precisely to the extent that
reasonable professional judgment supports the limitation of
the investigation. *See id.* at 690–91, 104 S.Ct. at 2066. In
undertaking the necessary assessment, courts are to make all
reasonable efforts to avoid distorting effects of hindsight. *See
Commonwealth v. Basemore,* 560 Pa. 258, 289, 744 A.2d 717,

6. The main opinion in *Commonwealth v. Romero,* 595 Pa. 275, 938 A.2d
362 (2007), suggests that *Williams* and *Wiggins* do not apply to cases
tried prior to their issuance. However, only three Justices supported
this position in *Romero. Compare id.* at 317–19, 938 A.2d at 387–88,
*with id.* at 333–34, 938 A.2d at 397 (Cappy, C.J., joined by Baer, J.), and
*id.* at 335, 938 A.2d at 398 (Saylor, J., joined by Baldwin, J.). Further,
the position alluded to by the *Romero* lead was rejected previously by
the Court on developed reasoning. *See, e.g., Commonwealth v. Hughes,*
581 Pa. 274, 361–62 n. 56, 865 A.2d 761, 813–14 n. 56 (2004) ("As here,
. . . rulings in [*Williams* and *Wiggins*] were issued in the context of
collateral review, occurring many years after trial."). Thus, we apply
the general principles discussed in *Wiggins* and *Williams* in this case.

735 (2000). Nevertheless, courts must also avoid *"post hoc* rationalization of counsel's conduct." *Wiggins*, 539 U.S. at 526–27, 123 S.Ct. at 2538.

In this case, the post-conviction evidence supports the PCRA court's conclusion that, given the information that was known (or which reasonably should have been known) to Appellant's trial counsel—including the fact of Appellant's two recent psychiatric hospitalizations and the recorded descriptions of his behavior as unpredictable and psychotic—counsel should have considered the development and presentation of mental-health mitigation at the penalty phase of trial.[7] As the PCRA court concluded, expert testimony, combined with information contained within the records of Appellants recent psychiatric hospitalizations, could have served as evidence that Appellants mental-health condition impacted on his conduct in a way that was relevant to the jurors assessment of the degree of his moral culpability. For example, Dr. Krop described records of Appellants condition at the time of his psychiatric hospitalizations (four and seven months prior to his capital offense) as:

> consistent with a very seriously disturbed individual who [sic] emotional ability and other emotional indicators are indicating more and more severe.

> I mean I think the interesting thing in terms of the records in this case what it shows from March then June and now September leading up to the incident in question, it appears that [Appellant's] behavior was just getting more bizarre and more unpredictable and more—reflects certainly more severe impairment getting closer and closer to the time in question.

7. To some degree, counsel attempted to justify his performance in terms of deferral to the investigation by his predecessor counsel from the public defender's office. His testimony in this regard, however, was inconsistent, as he variously testified that he thought that he received "a comprehensive record" at least with respect to the psychiatric hospitalizations, N.T., May 17, 2007, at 39, and that "there was almost nothing in the file" that he received, *id.* at 10, 640 A.2d 1251. What was clear to the PCRA court in light of the evidence, however, is that a substantial avenue for the development of mitigation was overlooked.

* * *

[A]t the time that the offense occurred [Appellant] was suffering from a serious emotional disturbance and that would be a combination of his alcohol abuse, his depression and his PTSD . . . .

And I think it's a combination of all three of those separate diagnostic entities, operating in interaction with each other that would lead me to say that he had a very serious emotional disturbance at the time in question.

N.T., May 15, 2000, at 75–76, 82.

The Commonwealth is correct that, like most other decisions related to trial strategy, there would have been both advantages and disadvantages associated with the presentation of mental-health mitigation. The PCRA court's essential finding, however—that the omission from consideration by the sentencing jurors of the diagnosis of Axis I major mental-health disorders and recent psychiatric hospitalizations occurred in this case in the absence of a sufficient investigation and without strategic or tactical justification—is supported by the evidence.[8] Further, the PCRA court reasonably concluded that there is a sufficient probability that, had the jurors been apprised of the evidence, at least one would have found the mitigating circumstance under Section 9711(e)(2) and determined that its weight was equal to or greater than the single aggravating circumstance. *See Wiggins,* 539 U.S. at 537, 123 S.Ct. at 2543 (articulating the prevailing standard for assessing prejudice from deficient stewardship in the presentation of mitigation evidence in terms of whether "there is a reasonable probability that at least one juror would have struck a different balance.").[9]

---

**8.** The PCRA court's conclusion is also supported by trial counsel's testimony that all of his pretrial efforts were directed toward the guilt phase. *See* N.T., May 17, 2000, at 45.

**9.** We also differ with the Commonwealth's suggestion that the prison psychologist functioned as a mental-health mitigation expert, since there is no evidence that his expertise was utilized in such fashion by trial counsel, and, indeed, the record suggests to the contrary. Further, we disagree with the Commonwealth's position that the PCRA court was required to discount Dr. Krop's testimony on account of Appel-

As to successor counsel, the PCRA court appropriately developed that neither post-verdict nor appellate counsel provided essential support for the claim of trial counsel ineffectiveness in the failure to investigate and present available mitigation. *See Durst*, 522 Pa. at 5, 559 A.2d at 505 (discussing the requirement for an offer of proof relative to a collateral claim challenging counsel's stewardship). Deficient stewardship is manifest where, as here, successor lawyers raise the relevant claim but fail to develop it in a fashion which could possibly yield relief, thereby causing the claim to be rejected summarily. It seems unlikely that any reasonable strategy could justify such an approach, and, certainly, none was developed on the present post-conviction record. The prejudice criterion of the ineffectiveness inquiry is met for the same reason as it is with regard to the underlying ineffectiveness claim. The claim that post-verdict and appellate counsel identified, but unjustifiably forfeited, was meritorious and should have yielded relief, and it was considerably stronger than the other claims that those attorneys pursued, many of which were rejected out of hand. *Accord Commonwealth v. Gorby*, 589 Pa. 364, 392, 909 A.2d 775, 792 (2006).

For these reasons, we find no legal error in the PCRA court's finding of ineffectiveness on the part of all counsel.[10]

## II. The Denial of Relief from the Convictions

### A. Proceedings for Attorney Charles' Withdrawal

In rejecting Appellant's claims that he was deprived of his Sixth Amendment right to counsel and due process of law in the attorney withdrawal proceeding before Chief Justice Nix, the post-conviction court observed that public defender personnel served as Appellant's attorneys of record throughout the withdrawal proceedings. According to the court, in seeking to be relieved from the representation, the public defend-

lant's embellishments concerning his war record, since as Appellant has developed, Dr. Krop adequately discussed the independent bases for his opinion in his testimony as credited by the PCRA court.

10. Given our disposition, above, it is unnecessary to address the PCRA court's alternative basis supporting the award of a new penalty hearing.

er's office was pursuing Appellant's interest in, and express desire for, new representation. *See, e.g.,* N.T., August 14, 1985, at 75, 98–99 (reflecting Appellant's statement to the trial court, "I hope you allow Mr. Charles to withdraw ... [b]ecause on record I won't go to trial with Mr. Charles," and that his sentiment also applied to the entire public defender's office). Alternatively, the PCRA court did not believe that a defendant needed to be represented by counsel in connection with the setting of a trial date. Although the court recognized that an indigent criminal defendant is entitled to be represented by appointed counsel at all critical stages of the proceedings against him, *see generally United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967) (explaining that the Sixth Amendment guarantees representation by counsel "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial"); *see also Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 1240–41, 152 L.Ed.2d 291 (2002), it regarded the setting of a trial date as a ministerial matter, and not a critical stage of the criminal proceeding. In this respect, the court observed that scheduling is often performed by court staff or, in some jurisdictions, the district attorney's office. The PCRA court also highlighted Appellant's failure to provide relevant legal authority supporting his contention that establishing a trial date is a critical matter. In any event, the court reasoned, trial counsel was not precluded from requesting a continuance if he believed it was necessary. *See Williams,* No. 981/1984, *slip op.* at 22–24 & n. 7 (10/17/03).

Appellant first challenges the PCRA court's factual finding that he was represented by counsel before Chief Justice Nix. Appellant develops that the withdrawal submissions filed by Attorney Charles and his staff were styled as adversary proceedings, with an assistant public defender named as Attorney Charles' counsel and Appellant specifically identified as a party-respondent. Further, Appellant emphasizes a remark attributable to his ostensible counsel at the time, made in the initial withdrawal proceedings before the trial court, in which

the assistant public defender indicated that "Mr. Williams is here uncounseled and ... his attorney is here in an adverse proceeding." N.T., August 14, 1985, at 50; *see also* N.T., May 16, 2000, at 80 (reflecting the comment of an assistant public defender that "[o]n that day my concern was that [Appellant] was, in fact, unrepresented on a number of issues"). Appellant recognizes that he was technically represented by the public defender's office until that office finally was relieved after the informal conference before Chief Justice Nix. However, he points to the public defender's own position that the office was burdened with a serious and irreconcilable conflict of interest—given such acknowledged conflict, Appellant maintains that he was effectively unrepresented.

Appellant does not suggest that matters regarding withdrawal and/or substitution of counsel implicate critical stages *per se.* He contends, however, that the importance of the challenged conference was heightened, because it encompassed the time period to be allowed for trial preparation by his yet-to-be-appointed trial counsel. Appellant claims that this timing issue was irreversibly determined by Chief Justice Nix, in response to the Commonwealth's argument that trial already was overdue and that the public defender's application was interposed solely to delay trial.[11] Appellant asserts that, in response, and on account of the attitude and interests of Attorney Charles and his staff, the public defender's office bartered a short-term trial date in return for the authorization of the desired withdrawal, without providing Appellant any say in the matter. According to Appellant, under the Sixth Amendment, he was constitutionally entitled to advocacy concerning how much time his new attorney would have to prepare for trial. In this regard, Appellant references *Yohn v. Love,* 76 F.3d 508 (3d Cir.1996) (sustaining an award of relief from a judgment of sentence based upon *ex parte*

11. In support of his contention that Chief Justice Nix directed not only a substitution of counsel but also an expedient trial date, Appellant develops that the trial court's resultant order indicated that Chief Justice Nix had suggested both the appointment of outside counsel and the continuance of the case for only one trial term, thus resulting in the scheduling of the matter for trial in less than a month's time.

contacts between Chief Justice Nix and a prosecutor concerning an issue of evidentiary admissibility), and *Appel v. Horn*, 250 F.3d 203 (3d Cir.2001) (awarding relief in favor of a capital defendant based on his lack of counsel throughout a twelve-day period during which his competency was being evaluated). Further, Appellant characterizes the amount of time that his trial counsel was allotted to prepare, twenty-one days, as unconscionable. Moreover, he argues that it is unreasonable to expect that his trial counsel could have obtained a continuance from the trial judge, after the trial date had been established by the Chief Justice of Pennsylvania.

Appellant also contends that the proceedings before Chief Justice Nix were *ultra vires* and violated his due process rights. In this regard, Appellant challenges the procedure employed by the public defender to bring the matter before the Court, asserting that jurisdiction was not properly invoked; he complains of the handling of the matter by a single Justice rather than the full Court; and he criticizes the off-the-record character of the proceedings and, again, the absence of Appellant and/or counsel on his behalf.

In response, the Commonwealth challenges Appellant's statement that no attorney was present to represent him in the proceedings before Chief Justice Nix. According to the Commonwealth, the assistant public defenders, as attorneys of record for Appellant, were at all times focused on Appellant's desire to have their office removed from the case, as well as upon preventing any conflict from arising in the continued representation. The Commonwealth also differs with Appellant's indication that trial date was set at the suggestion of Chief Justice Nix. According to the Commonwealth: "As all counsel assembled at the informal hearing testified, there was no discussion of a new trial date, and Chief Justice Nix never set a date or directed [the trial judge] to do so." Principal Brief for Appellee at 15.

Concerning the establishment of the trial date by the trial court, the Commonwealth supports the PCRA court's position that this is a ministerial undertaking as opposed to a critical stage of the adversarial proceedings. The Commonwealth

also asserts that nothing precluded Appellant's new counsel (trial counsel) from requesting a continuance pursuant to Rule of Criminal Procedure 578 (then Rule 304), if he believed that the timing would prevent him from preparing properly for trial. The Commonwealth acknowledges that trial counsel, at the post-conviction stage, testified to his recollection that he asked the trial judge for a continuance and was told that it would not be granted, but notes that counsel also acknowledged that he had not perfected this request by filing a formal motion. *See* N.T., May 17, 2000, at 21–22. Additionally, the Commonwealth makes particular note of the following passage from trial counsel's testimony:

> I think any defense attorney will tell you they can always use an extra day, an extra week. I didn't know this [sic] medical records existed from Norristown State Hospital. In retrospect, I certainly could have used more time. However, when I went to trial with Mr. Williams I believed that both he and I felt that we were ready to go to trial.

N.T., May 17, 2000, at 50.

Finally, the Commonwealth argues that the informal proceeding before Chief Justice Nix did not violate Appellant's constitutional entitlement to due process, as the request itself was a proper one under Rule of Appellate Procedure 3309, which sets forth the means by which a party may seek extraordinary relief from the Supreme Court and was properly filed and served on all affected parties. The Commonwealth also notes that the application was never formally addressed, since it was dismissed as moot.[12]

 Initially, Appellant's claims of trial court error are waived, since they were not raised in the proceedings before the trial court, in post-verdict motions, and on direct appeal. Appellant also asserts deficient stewardship on the part of his trial, post-verdict, and direct-appeal counsel; however, the

---

12. The Commonwealth also argues that Appellant's claims in this line are not cognizable under the PCRA, because they do not implicate the truth-determining process. *See* 42 Pa.C.S. § 9543(a)(2). Since we conclude, infra, that the claims lack adequate foundation for other reasons, we need not address this argument here.

first two sets of these claims also are waived, since they were not raised on direct appeal, and Appellant's only potentially extant claim at the present, post-conviction stage is that of ineffective assistance of his substitute counsel on direct review. Particularly as the PCRA court's opinion focuses on the merits of the underlying claims of trial court error, we will review the opinion and arguments on such terms. Again, however, as with other claims of trial court error and ineffective assistance of trial and post-verdict counsel discussed below, we consider these underlying aspects solely as a means of addressing the only potentially extant claim—that of deficient stewardship on the part of counsel on direct appeal. *Accord, e.g., Commonwealth v. Washington,* 592 Pa. 698, 736, 927 A.2d 586, 608 (2007) (addressing the merits of an underlying claim of trial court error to resolve a derivative ineffectiveness claim).

Next, we observe that both parties' recitations of the salient facts contain material inaccuracies. On the one hand, Appellant's repeated assertion of bartering on the part of the public defender was not accepted as a fact by the PCRA court and, indeed, is unsupported by any direct evidence of record. However, the Commonwealth's claim that the trial date was not discussed at all conflicts with the district attorney's testimony concerning his conversation with the trial judge following the proceeding:

I think I indicated to [the trial judge] that Chief Justice Nix had indicated to me that it would be in the Commonwealth's interest if expediency and quick trial date were factors that we wanted to take into account, that the case could be set and disposed of more quickly by appointing substitute counsel for the public defender than by me arguing a position in front of the Supreme Court that was sure to lose.

N.T., October 3, 2000, at 13–14. Thus, it appears that the matter of the trial date was at least discussed with Chief Justice Nix, and that aspects of such discussion were conveyed to the trial judge, as his resultant order indicates.

It remains to consider the PCRA court's conclusion that the informal proceeding before Chief Justice Nix did not

comprise a critical stage. If such proceedings had resulted in the irrevocable setting of a trial date, Appellant's position might carry more force. However, the PCRA court's reasoning encompasses an essential finding that a future continuance, based on developing circumstances as might be conveyed by Appellant's substitute counsel, was not foreclosed. We believe that, in resolving this factual matter, inference served a critical role, in the absence of persuasive direct evidence. Here, there is abundant evidence that Chief Justice Nix's central concern was the withdrawal of counsel, and that the discussions of trial timing were collateral. In these circumstances, we decline to disturb the PCRA court's reasonable inference that Chief Justice Nix's suggestions did not foreclose the possibility of a continuance.

We also find the circumstances to be substantially different from those before the courts rendering the *Yohn* and *Appel* decisions referenced by Appellant. As the Commonwealth develops, *Yohn* concerned *ex parte* contacts between Chief Justice Nix, a prosecutor, and a trial judge. *See Yohn*, 76 F.3d at 513–14. Here, by contrast, counsel of record for Appellant was noticed and present for all relevant proceedings. Although such counsel had styled the matter as an adversary proceeding against the client, the interests of counsel and the client were aligned insofar as both favored the withdrawal, and the PCRA court's apparent conclusion that counsel had not completely abandoned Appellant's interests in all other respects is supported by fair inferences from the record. *Appel* concerned a competency proceeding, *see Appel*, 250 F.3d at 218, a matter substantially different from the substitution of counsel with the defendant's approval.

We recognize that the proceedings before Chief Justice Nix were unusual. Irregularity, however, does not necessarily arise to a constitutional violation. Contrary to Appellant's perspective, the PCRA court did not find that Chief Justice Nix directed a specific and/or irrevocable trial date, and we do not believe that such finding is inescapable on the present record. Again, there is no finding or evidence that Chief Justice Nix caused the trial judge to be predisposed against

the award of a continuance on a request by trial counsel upon his appointment, and in light of developing circumstances described. Since the allegation of the unavailability of a continuance on account of Chief Justice Nix's involvement is a linchpin to Appellant's argument that the withdrawal proceedings constituted a critical stage of the proceedings against him, we conclude that the claim does not yield a basis for relief from the convictions.

Finally, regardless of the technical propriety of the proceedings before Chief Justice Nix, the former Chief Justice did not make any definitive ruling. Appellant does not suggest that a pre-disposition, informal conference with attorneys was *per se* impermissible at the Supreme Court level in the relevant time period. While Chief Justice Nix apparently conveyed his inclination to issue a definitive order in the absence of reconsideration by the trial court, this eventuality never came to pass. In these circumstances, we differ with Appellant's assertion of a due process violation giving rise to relief.

### B. Conditions on Trial Counsel's Representation

Appellant also styled a separate claim based on his contention that the limited time available to trial counsel to prepare, the $3,500 fee cap, and the $500 limitation on investigative services placed untenable restrictions on the representation. In response, the PCRA court first rejected Appellant's assertion of a constructive denial of counsel, as to which prejudice must be presumed. The court noted that existing cases had sanctioned shorter timeframes for counsel to prepare a case without the defendant being constructively deprived of the assistance of counsel. *See Williams,* No. 981/1984, *slip op.* at 26–27 (10/17/03) (citing *Avery v. Alabama,* 308 U.S. 444, 447, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940) (finding that counsel appointed within three days of trial was not *per se* ineffective)); *United States v. Cronic,* 466 U.S. 648, 665–56, 104 S.Ct. 2039, 2050–51, 80 L.Ed.2d 657 (1984) (holding that the presumed prejudice doctrine did not apply where counsel was afforded twenty-five days for trial preparation). In terms of the fee cap, the PCRA court explained:

> In *Cronic,* the United States Supreme Court held that a presumption of ineffectiveness [applies] ... without inquiry into counsel's actual performance at trial, only when surrounding circumstances justify such a presumption. Such circumstances include the complete denial of counsel at a critical stage or counsel's failure to subject the prosecution's case to a meaningful adversarial process. Circumstances of lesser magnitude generally provide no basis for finding a Sixth Amendment violation unless the Defendant can show how specific errors of counsel undermined the reliability of the finding of guilt.
>
> Based upon this standard, we cannot say that the fee cap created a presumption of ineffectiveness. It is obvious that [Appellant] was not denied counsel nor did his counsel fail to subject the prosecution's case to a meaningful adversarial process. Indeed, the Pennsylvania Supreme Court agreed with the trial court's assessment that counsel's examination and cross-examination of witnesses was "thorough and exacting," and that counsel appeared "well-organized and aptly prepared."

*Williams,* No. 981/1984, *slip op.* at 27–28 (10/17/03) (citations omitted). The PCRA court also credited trial counsel's post-conviction testimony to the effect that the fee cap simply was not a factor in the quality of the representation that he provided to Appellant. *Id.* at 28–30 (citing N.T., May 17, 2000, at 7, 47–48).[13]

Presently, Appellant maintains the argument he made before the PCRA court, including the assertion of a constructive denial of counsel. *See Cronic,* 466 U.S. at 658–59, 104 S.Ct. at 2046–47; *see also Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (discussing structural error and the related concept of presumed prejudice). He posits that twenty-one days is insufficient to prepare for a modern-day capital case, particularly one with prosecution witnesses spread across the country. Appellant develops that, during the post-conviction evidentiary hearing,

13. The PCRA court did not reference the limitation on reimbursement for investigative services.

trial counsel testified that, from the time of his appointment through the conclusion of trial, he worked a minimum of fifteen hours per day. Based on this estimate, Appellant calculates that trial counsel invested approximately 585 hours in the case, and therefore, was paid only $5.98 per hour to represent a capital defendant. *Cf. Martinez–Macias v. Collins,* 979 F.2d 1067 (5th Cir.1992) ("The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for."). According to Appellant, such insufficient payment substantially contributed to a structural error which pervaded the entire trial. In support of his argument, Appellant references a line of cases arising principally out of Florida, exemplified by *Makemson v. Martin County,* 491 So.2d 1109 (Fla.1986). Appellant also highlights trial counsel's post-conviction testimony, in which he indicated that the $500 investigative fee approved by the trial court was futile given the task at hand. *See* N.T., May 17, 2000, at 22; *see also id.* at 55 (reflecting counsel's comment: "I didn't have the time or the finances or the ability to ... I was a single attorney assigned to a capital homicide with no budget"). Additionally, Appellant asserts that the PCRA court wrongly considered each facet of his claim of constructive denial in isolation, thus underweighting the cumulative significance of all aspects. Appellant further develops that trial counsel amassed a significant disciplinary record relative to his performance in other matters, which Appellant suggests is a reflection on counsel's credibility and competence.

Even if this Court rejects the claim of constructive denial and applies the test set forth in *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69 (delineating the touchstone for evaluating the ultimate impact of counsel's performance as "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt"), Appellant claims to have established prejudice at the post-conviction evidentiary hearing. Appellant contends that, on account of his counsel's inability or failure to investigate, the jurors at his trial were never presented with many facts which would have raised a reasonable doubt as to Appellant's

guilt. He complains that trial counsel failed to travel to any of the many states involved in the investigation to speak with any of the dozens of witnesses mentioned in the police reports, or even to interview many of the local persons also mentioned in the reports, including pimps, prostitutes, or alternate suspects. For example, Appellant develops that trial counsel testified that Tammy Schenkel was a crucial witness because she was a prostitute; she had a pimp with a .38 caliber revolver; and, according to her statement to the police, she had a sexual encounter with the victim shortly before his death. *See* N.T., May 17, 2000, at 55–57. Although he never spoke with her before trial, counsel identified Schenkel as an alibi witness, *id.* at 53, but was only able to find her after trial, *see id.* at 54. Appellant also discusses two other individuals, Gary and Debbie Paquette, who assertedly acted as pimp and prostitute, possessed guns, and also were subjects of the police investigation before it centered upon Appellant. *See* N.T., May 17, 2000, at 65–79 (reflecting trial counsel's post-conviction testimony concerning the Paquettes). Appellant contends that the reports projected significant doubts concerning his guilt, referencing a litany of federal decisions in which criminal defense attorneys were deemed ineffective relative to their guilt-phase investigation. *See* Principal Brief for Appellant at 46–47 (citing cases). Centrally, Appellant claims that counsel failed to so impeach the prosecution's theory by showing that there were numerous other suspects who had motive, opportunity, and the means to commit the offense. Whether this asserted failure resulted from the objective conditions under which trial counsel labored, or from his own ineffectiveness, Appellant contends that it resulted in a deprivation of his right to effective counsel secured by the federal and state constitutions.

For its part, the Commonwealth develops that the presumption of prejudice discussed in *Cronic* applies within a very narrow spectrum of cases. *See Chadwick v. Green,* 740 F.2d 897, 900 (11th Cir.1984) (elaborating on the narrow range of cases manifesting a fundamental breakdown in the adversarial process and explaining that "the [*Cronic* ] Court made clear

that a presumption of prejudice from a trial court's refusal to postpone a criminal trial will arise in only very limited and egregious circumstances"). The Commonwealth also observes that the United States Supreme Court has declined to create a rule under which every conviction that followed a "tardy appointment of counsel" would be reversed *per se*. *Chambers v. Maroney*, 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970). With regard to the fee cap and asserted restriction on investigative assistance, based upon the standard posited by *Cronic*, the Commonwealth maintains that neither creates a presumption of ineffectiveness. In this regard, the Commonwealth explains that the *Cronic* Court emphatically stated that courts will not infer or presume ineffectiveness merely on account of such factors as length of preparation or lack of prior experience or expertise. Rather, the Court directed the focus to whether there had been an actual breakdown in the adversarial process during trial. *See Cronic*, 466 U.S. at 658–59, 104 S.Ct. at 2046–47. The Commonwealth reiterates that the voluminous record of the case demonstrates that counsel subjected the prosecution's witnesses to extensive cross-examination, made innumerable objections, and fought very hard for his client. *Accord Williams*, 537 Pa. at 28, 640 A.2d at 1265 (reflecting this Court's finding, upon its review of the record, of the same).

In terms of Appellant's claim of demonstrated prejudice, the Commonwealth finds it significant that, based on trial counsel's post-conviction testimony, both he and Appellant felt that they were ready to go to trial. *See* N.T., May 17, 2000, at 50. Further, the Commonwealth contends that, on PCRA review, Appellant failed to develop an evidentiary record raising a reasonable doubt concerning his guilt. With regard to Schenkel and Schissler, the Commonwealth notes that both testified in the post-verdict proceedings, where the common pleas court concluded that their testimony would not have assisted Appellant. *See Commonwealth v. Williams*, No. 981/1984, *slip op.* at 38 (C.P. Lehigh June 29, 1990) (*en banc* ).[14] Relative to the Paquettes, the Commonwealth focus-

---

**14.** At the post-verdict hearing, Appellant offered testimony from two co-prisoners implicating Schissler as having killed Mr. Miller and Schenk-

es on trial counsel's PCRA testimony that the police reports referenced by Appellant would not have been particularly helpful, stating:

> If I had been able to contact those individuals, if I had been able to produce those individuals, if those individuals had gotten on the stand and said, yes, I killed Eddie Miller or I was in the area, it may have been relevant. But the fact of the matter is trying to get that evidence before a jury would have been incredibly difficult, because it's just speculation and probably wouldn't have been admissible.

N.T., May 17, 2000, at 95–96.

▉ We agree with the PCRA court and the Commonwealth that trial counsel subjected the prosecution's case to meaningful adversarial testing, and therefore, the doctrine of presumed prejudice is not applicable. Both the PCRA court and the Commonwealth appropriately develop that in *Cronic* itself the United States Supreme Court held that a newly-appointed attorney, who was afforded only twenty-five days to prepare for trial in a case which the government spent four and one-half years investigating and preparing, was not *per se* ineffective. *See Cronic*, 466 U.S. at 663–66, 104 S.Ct. at 2049–51. The fact that counsel was a young real estate attorney trying his first criminal case, the severity of the criminal charges, the complexity of the matter, and the inaccessibility of witnesses to counsel did not, individually or in combination, provide a basis for concluding that counsel could not render adequate stewardship. *See id.; see also Avery*, 308 U.S. at 447, 60 S.Ct. at 322 (holding that it was not presumptively unreasonable to expect capital counsel appointed three days before trial to prepare, and the attorney was not *per se* ineffective).

Neither the fee cap nor the asserted limitation on investigative fees, individually, or collectively with the time constraints,

---

el as a material witness. One of the prisoners recanted his post-verdict testimony in this regard, and the *en banc* court found the other not to be credible, while finding credible the testimony of Schenkel and Schissler to the effect that they knew nothing about the killing. *See Williams*, No. 981/1984, *slip op.* at 38 (6/29/90).

implicates presumed prejudice. In terms of the fee cap, the Florida cases referenced by Appellant are inapposite. For example, in *Makemson,* the court-appointed attorney sought fees in excess of a statutory maximum. The court of original jurisdiction upheld the statute but certified the question of its validity as one of great public importance, and the Florida Supreme Court found such fee maximums to be unconstitutional when applied to cases involving extraordinary circumstances and unusual representation. *See Makemson,* 491 So.2d at 1110. The court later indicated that virtually all capital cases involve extraordinary circumstances. *See White,* 537 So.2d 1376, 1380 (Fla.1989).

Here, by contrast, trial counsel did not contest the fee limitation, but rather, accepted it and expended substantial efforts in the advancement of his client's cause. His explanation on post-conviction review was that he regarded the acceptance of court appointments as part of his duty as an attorney, and that the fee limitation had no effect upon his performance. *See* N.T., May 17, 2000, at 7–8. While certainly in other circumstances such a fee limitation may be problematic, trial counsel's voluntary acceptance of full responsibility for the representation subject to the limitation does not fall within the narrow category of cases reflecting a breakdown in the adversary process as discussed in *Cronic.* Similarly, the asserted $500 limitation on investigative services is appropriately regarded as a component of a layered ineffectiveness claim subject to the requirement to prove prejudice.

 We also agree with the PCRA court and the Commonwealth that Appellant has failed to prove prejudice. Aside from his generalized challenges, Appellant's efforts are centered on demonstrating that Schenkel, Schissler, and the Paquettes were reasonable suspects in the killing. However, as the Commonwealth develops, Appellants efforts to implicate Schenkel and Schissler collapsed to a significant degree on post-conviction review when one of his prisoner-witnesses admitted to fabricating his testimony. *See Williams,* 537 Pa. at 26, 640 A.2d at 1263. Further, the trial court rejected the other prisoner-witness's testimony on credibility grounds, a

fact which Appellant fails to address. While under the recent *Collins* decision, layered ineffectiveness claims are distinct from the underlying claims, the underlying claims remain an essential component, *see Collins*, 585 Pa. at 60–61, 888 A.2d at 573, and it should now go without saying that those challenging a verdict must attend to all aspects of their claims for relief. Appellant's failure to address the common pleas court's holding on post-verdict review, and this Court's holding on direct appeal, relative to Schenkel and Schissler undermines his claim for relief here.

As to the Paquettes, Appellant's contentions are fairly generalized. Although he claims to have established motive, opportunity, and means on their part relative to the killing, *see* Principal Brief for Appellant at 47, the support which he offers is merely a discussion of hearsay recitations from initial police reports, which oftentimes contain a collage of fact, innuendo, and false leads, such as those pointing to Schenkel and Schissler. *See, e.g., id.* at 44–46 (developing hearsay references attributable to a person described as a pimp to the effect that he witnessed Mr. Paquette in possession of a .38 caliber handgun and had suspicions concerning the Paquettes' potential involvement in Mr. Miller's death). Further, although he submitted a reply brief, Appellant does not address the Commonwealth's contention that he failed on post-conviction review to create a record concerning prejudice, in the form of affirmative, admissible evidence concerning the Paquette's involvement in the killing. We agree with the Commonwealth, particularly in light of: Appellant's confession to having committed the killing, *see* N.T., September 24, 1985, *et seq.* at 1012; his implausible recantation, *see id.* at 1462–64 (reflecting Appellant's claim that he confessed to the killing on account of threats by a gun-running, drug-dealing adversary made because Appellant "knew too much" about the adversary's activities); the evidence that Appellant possessed Mr. Miller's truck at a time within the medical examiner's estimate of the time of death and during which the victim broke all routine, *see id.* at 999–1001; Appellant's possession and use of Mr. Miller's credit cards and other items of personal property, *see, e.g., id.*

at 1553; and other circumstantial evidence introduced by the Commonwealth. *Accord Williams*, 537 Pa. at 21–22, 640 A.2d at 1261–62 (characterizing the evidence of Appellant's guilt as overwhelming). At bottom, none of the other suspects confessed to having committed the killing or otherwise was shown to have been traveling with Mr. Miller and to subsequently have taken possession of his truck and personal property.

## C. Failure to Retain Experts

The PCRA court rejected as previously litigated Appellant's claim that trial counsel was ineffective for failing to retain expert witnesses to rebut the Commonwealth's theory of the case that Mr. Miller was killed during the day on October 20, 1983. The time of death was significant to the defense, since Appellant produced a witness at trial who indicated that she saw the victim on October 21, 1983, at a time when Appellant asserts he had left Kuhnsville in the company of Ms. Manion. *See* N.T., September 24, 1985, *et seq.* at 1358. The PCRA court ruled that this claim was previously litigated and declined to permit evidentiary development. *See Commonwealth v. Williams*, No. 981/1984, *slip op.* at 8–9 (C.P. Lehigh Jan. 5, 2000). In rejecting this claim, this Court relied upon *Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990), for the proposition that a defendant alleging that expert evidence should have been introduced at trial must identify the available evidence and expert, *see id.* at 351–52, 572 A.2d at 692, and *Commonwealth v. Clemmons*, 505 Pa. 356, 479 A.2d 955 (1984), for the principle that trial counsel need not introduce expert testimony if he is able to effectively cross-examine prosecution witnesses and elicit helpful testimony, *see id.* at 363, 479 A.2d at 958–59. *See Williams*, 537 Pa. at 29, 640 A.2d at 1265; *cf. Commonwealth v. Copenhefer*, 553 Pa. 285, 308 n. 12, 719 A.2d 242, 253 n. 12 (1998) ("[T]rial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony which was presented by the prosecution."), *overruled on other grounds in Commonwealth v. Rizzuto*, 566 Pa. 40, 72–74, 777 A.2d 1069, 1088–89 (2001).

Appellant frames his present argument around the medical examiner's testimony that Mr. Miller could have died either on October 20 or October 21. *See* N.T., September 24, 1985, *et seq.* at 801–802. Given the importance to the defense of a more precise determination of the time of death, Appellant asserts that competent counsel would have retained a forensic pathologist to provide expert testimony. On post-conviction review, he has now presented a declaration from Dr. Jonathan Arden, First Deputy Chief Medical Examiner for the City of New York, who reviewed the medical examiner's testimony. Appellant complains, however, that Dr. Arden's review was significantly hampered by the fact that the autopsy report, photographs, and medical examiner's files were not made available to his current, post-conviction counsel. As a result, Appellant reports, Dr. Arden was unable to reach any definitive conclusion with respect to the validity of the medical examiner's estimate of the time of death. Dr. Arden did indicate, however, that there are significant questions as to that estimate:

> Dr. Mihalakis testified that in his opinion the decedent died approximately five to six days before the autopsy was conducted on October 26, 1983. Without having available to me the autopsy report and photographs and the medical examiner's file, I cannot reach any conclusion to a reasonable degree of medical certainty as to the validity of this estimate. There are, however, several factors described in Dr. Mihalakis' testimony, particularly relating to the degree of decomposition of the decedent's body, that suggest the possibility that an estimate of a later time of death would be more accurate. The lack of access to the materials on which the medical examiner relied precludes me from analyzing all of the relevant data and reaching any conclusion to a reasonable degree of medical certainty.

Declaration of Jonathan L. Arden. Appellant also presented a declaration from a crime scene analyst, Dale Nute, Ph.D, who, based on a review of photographs of the victim's body as it was found, opined that the body would readily have rolled if the truck was driven at any speed or around curves or

corners. According to the declaration, Mr. Nute also believes that a number of the physical findings are inconsistent with such movement, thus supporting his defense that Mr. Miller was killed at the location where the body was found, and demonstrating the falsity of Appellant's confession to having killed Mr. Miller at a remote location. Further, the declaration reflects that Mr. Nute is also of the opinion that the medical examiner's files may contain information that has a bearing on his theory as well. Appellant complains that, because the medical examiner's files were not made available to his present counsel, he is unable to demonstrate the full extent of the prejudice that flowed from counsel's deficient performance. Nevertheless, he contends that any evidence that would have led the jurors to question whether Mr. Miller was not killed until October 21, or that the victim was killed after the rig was returned to the location in which it was found, would give rise to a reasonable likelihood that Appellant would be acquitted on the basis of his alibi.

Appellant acknowledges this Court's reference to *Holloway* in addressing this claim on direct appeal; however, he asserts that such decision is in tension with the prejudice prong of the *Strickland* inquiry into ineffectiveness matters. According to Appellant, cross-examination of a prosecution expert oftentimes cannot mitigate prejudice that can result from trial counsel's failure to present his own witnesses. Appellant contends that he has proffered real prejudice that inured against him because the jury did not hear from Dr. Arden or Mr. Nute. Appellant urges that this Court should award a new trial based on this ineffectiveness or, alternatively, remand the claim for evidentiary development.

The Commonwealth asserts that this claim is previously litigated and meritless. The Commonwealth observes that it introduced testimony including the following:

(1) the victim's family to say that he had not called them on the evening of October 20, 1983, as he said he would, and he never showed up on October 21, when he was supposed to; (2) trucking company representatives, who stated that the victim had failed to call in on October 20, which would have

been consistent with what he usually did twice a day; (3) a representative from the motel to show that the victim checked out on the morning of October 20, 1983; (4) Monica Manion, who met up with [Appellant] on the evening of October 20, 1983, at a truck stop in Bloomsbury, New Jersey, and saw [Appellant] with the victim's tractor and trailer as well as other personal belongings of the victim such as a flashlight, blue suitcase and logbook cover, with which, presumably, a live Mr. Miller would not have parted; and (5) Pennsylvania State Trooper Mark Levisky, to whom Williams confessed that he shot and killed the victim on the morning of the day he met up with Monica Manion in Bloomsbury, New Jersey.

Principal Brief for Appellee at 30–31. The Commonwealth also develops that, in support of Appellant's alibi defense, trial counsel: introduced testimony from a cook at the truck stop where Appellant and the victim stayed, who testified that she saw the victim alive on October 21, 1983, *see* N.T., September 24, *et seq.* at 1354–62; cross-examined the Commonwealth's forensic pathologist and obtained his concession that he was unable to determine whether Mr. Miller died on October 20 or 21, 1983, *see id.* at 801–02, 104 S.Ct. 2052; elicited from members of the victim's family and trucking representatives that there may have been times when the victim broke from his routine of calling in at specified times of the day, *see id.* at 94–95, 369–73; and highlighted this evidence during his closing argument in his attempt to create reasonable doubt in the jurors' minds. *See id.* at 1571, 1582–83. According to the Commonwealth, in light of all the evidence presented to establish and refute the Commonwealth's position concerning the date and time of Mr. Miller's death, Appellant's assertion that trial counsel was ineffective for failing to call experts to rebut the prosecution's theory is untenable. Further, the Commonwealth contends that Appellant has failed to demonstrate prejudice.

Appellant essentially concedes that he cannot concretely demonstrate prejudice on the present claim, and he has not framed the claim in terms of any assertion of error on the part

of the PCRA court for failing to require some form of requested document production from the medical examiner. Thus, regardless of the appropriate breadth of the Court's comments from *Holloway* and *Clemmons* as applied to particular circumstances as they may arise in individual cases, no relief is due here.

### D. Record of the Suppression Hearing

 Appellant's next claim is that his appellate counsel was severely hampered, because there is no transcript from the hearing on Appellant's motion to suppress, which was litigated by prior counsel. Further, Appellant contends that the absence of the transcript impeded meaningful review in his direct appeal, as well as in his post-conviction effort. Appellant develops that, under federal constitutional law, a criminal defendant is entitled to review of his conviction based upon a full record, particularly in a capital case. *See, e.g., Dobbs v. Zant*, 506 U.S. 357, 358, 113 S.Ct. 835, 836, 122 L.Ed.2d 103 (1993) ("We have emphasized before the importance of reviewing capital sentences on a complete record."); *accord Commonwealth v. DeSimone*, 447 Pa. 380, 384–85, 290 A.2d 93, 96 (1972). Additionally, he argues that his appellate counsel was ineffective for failing to secure a comprehensive transcript.

The PCRA court addressed this claim by first noting that no counsel, prior or present, including PCRA counsel, had ever properly requested the transcription of the relevant notes of testimony. *See Williams*, No. 981/1984, *slip op.* at 32 (10/17/03). Additionally, the court explained that there are other means for preserving the record of a proceeding other than a verbatim transcript, and that an "equivalent picture" of the record is sufficient to ensure meaningful review. *Id.* at 33 (quoting *Commonwealth v. Albrecht*, 554 Pa. 31, 47, 720 A.2d 693, 701 (1998)). The PCRA court developed that the trial record contained a discussion of the issue at a sidebar conference, as well as testimony from Appellant concerning the voluntariness of his waiver of *Miranda* rights, *see id.* at 32–33, 720 A.2d 693 (citing N.T., September 24, 1985, *et seq.* at 1006–

1008, 1467, 1506–07, 1522–23), and the trial judge's opinion was thorough and exacting in terms of its recounting of the evidence presented at the suppression hearing. *See id.* Thus, the PCRA court determined that there was no prejudice.

Presently, the Commonwealth advances the PCRA court's rationale, adding that it is the appellant's responsibility to ensure the completeness of the record on appeal, and the petitioner's obligation on collateral attack. *See* Pa.R.A.P.1911, 1923; *Commonwealth v. Buehl,* 403 Pa.Super. 143, 148–49, 588 A.2d 522, 524 (1991).

We agree with the PCRA court and the Commonwealth that, at least in the absence of special circumstances, a missing transcript does not constitute a constitutional defect when a suitable alternative can be provided, and that the suppression court's findings, coupled with Appellant's evidentiary presentation at trial, comprise a sufficient record in this case. We recognize that the United States Supreme Court's plurality decision in *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), has been interpreted to hold that it is a violation of equal protection to make available a trial transcript to those who can afford it, but to deny transcripts to those who are indigent. *See id.* at 18, 76 S.Ct. at 590. In *Norvell v. Illinois,* 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963), however, the Court refused to extend *Griffin* to circumstances in which a transcript was unavailable on account of the death of the court reporter. As stated by the United States Court of Appeals for the Sixth Circuit: "Courts, interpreting *Griffin* and *Norvell* in the context of cases where transcripts were simply missing, have held that the Fourteenth Amendment does not require a word-by-word transcript where the production of such is impossible and the failure to produce the transcript is not invidiously motivated." *Bransford v. Brown,* 806 F.2d 83, 85 (6th Cir.1986) (citations omitted). Rather, as also developed in *Bransford,* to demonstrate denial of a fair appeal, a post-conviction petitioner must show prejudice resulting from the absence of the transcripts at issue. *See id.* at 86 ("Although this court recognizes the difficulty in demonstrating prejudice where the transcripts are

missing, petitioner must present something more than gross speculation that the transcripts were requisite to a fair appeal." (citations omitted)).

Here, Appellant's claim rests entirely upon an assertion of *per se* prejudice. *See* Principal Brief of Appellant at 56 ("The prejudice, inherent in appellate counsel's deficient performance, is that there was no record to review. Second, the lower court's no-prejudice finding ignores Appellant's assertion that appellate counsel's failure to secure the entire record of these capital proceedings constituted a constructive denial of counsel, for which no showing of prejudice is required."). We agree with the PCRA court and the Commonwealth that such arguments are insufficient to advance a constitutional claim (due process or equal protection), particularly in light of the available information contained in the trial record and the trial court's opinion.

### E. Ownership and Theft of Guns

In support of this claim, Appellant develops that: the victim was killed with a .38 caliber handgun; over the objection of the defense, the Commonwealth was permitted to introduce a .38 caliber handgun that Appellant allegedly stole from one trucker and later sold to another; several witnesses also testified that Appellant had in his possession a .25 caliber handgun, which he sold; and the Commonwealth also introduced evidence that, from 1971 to 1972, over ten years before the offense, Appellant had owned yet another .38 caliber handgun, which had no direct relation to his prosecution. Appellant explains that the Commonwealth did not contend that any of these handguns was the murder weapon, but instead, argued solely that the pistols were relevant to show that Appellant was familiar with handguns and had in his possession a gun of the same caliber as the murder weapon. According to Appellant, the Commonwealth actually was attempting to make two impermissible propensity arguments—that because Appellant allegedly stole a handgun, a crime with which he was never charged, he was likely to have robbed and murdered the victim; and that because Appellant was familiar

with guns, he had the propensity to commit criminal acts, including robbery and murder. Appellant contends that the prosecution's argument and the introduction of this evidence, which was unaccompanied by any limiting instruction, denied him his constitutional rights to due process and to a fair capital sentencing proceeding. In this regard, Appellant argues that, where the inflammatory nature of the evidence exceeds its evidentiary worth, the admission of such evidence violates due process. Principal Brief for Appellant at 58–59 (citing *Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir.1989) ("[T]his court, along with other federal courts of appeals, has recognized that the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation."), and *McKinney v. Rees*, 993 F.2d 1378, 1384–85 (9th Cir.1993) (holding that, in a murder prosecution where the victim was killed with a knife, the admission of evidence of the defendant's prior use of knives violated his due process interests)).[15] Appellant also contends that his trial counsel was ineffective for failing to request appropriate limiting instructions. *See generally Commonwealth v. Billa*, 521 Pa. 168, 179–80, 555 A.2d 835, 841–42 (1989) (cautioning that, because of the prejudicial effect of other crimes evidence, generally its admission must be accompanied by a cautionary instruction explaining the limited purpose connected with such proof). Further, Appellant asserts that his post-verdict and appellate counsel were ineffective for failing to raise and preserve associated claims, as well as the constitutional arguments. In response to the PCRA court's determination that this claim was previously litigated, Appellant observes that the constitutional due process theory was not raised on direct appeal, and there was no challenge to the absence of appropri-

---

15. However, as also developed by both of the United States circuit courts of appeals referenced by Appellant, the United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without [a limiting instruction]." *Saleh v. Fleming*, No. 04–35509, *slip op.*, 2008 WL 56006, at *1 (9th Cir. Jan. 3, 2008) (citation omitted); *Minett v. Hendricks*, 135 Fed.Appx. 547, 553 (3d Cir.2005) (observing that "most relevant Supreme Court cases suggest the contrary").

ate jury instructions. Appellant further claims that, because the Commonwealth incorporated by reference the evidence from trial at the sentencing hearing, the jury was automatically presented with an impermissible aggravating factor to consider.

The Commonwealth relies on the previous litigation doctrine. Further, it develops that the introduction of the weapons was relevant to establish several matters, forming part of the history of the case in tracing the movements of Appellant before and after the murder; helping to establish the identity of Appellant; showing Appellant's ability to readily obtain and dispose of guns; and corroborating his confession which he recanted at trial. Indeed, the Commonwealth emphasizes that this Court accepted that the weapons were relevant on such grounds at the direct appeal stage. *See Williams*, 537 Pa. at 20, 640 A.2d at 1260. The Commonwealth also suggests that, had it not presented to the jury the fact that Appellant had in his possession a .38 caliber gun that was not the murder weapon, it is likely that the defense would have claimed it was concealing exculpatory information. According to the Commonwealth, any prejudice revolving around the theft of the handgun was minimal, and the relevance far exceeded any prejudice. The Commonwealth also develops that, to avoid any confusion about the weapons, the trial court instructed the jurors that the weapons were not the murder weapons. *See* N.T., September 24, 1985, *et seq.* at 674. Additionally, the Commonwealth relies on this Court's alternate, harmless-error disposition of the claim on direct appeal. *See Williams*, 537 Pa. at 21, 640 A.2d at 1261 ("Even assuming it was error to have admitted these guns, in light of the overwhelming evidence of [A]ppellant's guilt, such error is harmless."). As to the penalty phase, the Commonwealth explains that the trial judge clearly told the jurors that their task was to weigh and consider the statutory aggravating and mitigating circumstances. *See* N.T., October 4, 1985, at 151–52.

This Court has sometimes addressed constitutional claims pertaining to "other crimes, wrongs, or acts" evidence such as may implicate criminal propensity by reference to our state evidentiary rules. *See, e.g., Commonwealth v. Williams*, 586

Pa. 553, 589, 896 A.2d 523, 544–45 (2006). Such approach is reasonable, since, in their requirements of relevance and probative value outweighing prejudicial effect, our evidentiary rules are more protective of the interests of criminal defendants than the due process requirements as articulated by those United States circuit courts of appeals which have discerned them. *Compare* Pa.R.E. 404(b)(3) ("Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs the potential for prejudice"), *with Lesko*, 881 F.2d at 52, and *McKinney*, 993 F.2d at 1384–85.[16] Thus, the Pennsylvania evidentiary rules appropriately address the concern for fundamental fairness in criminal trials, and Appellant's restyling of his claim as a constitutional one encompasses an effort to challenge this Court's reasoning on direct appeal.

We recognize that *Williams'* approach to the admission of evidence concerning the handguns is in tension with other precedent of this Court. *See Commonwealth v. Robinson*, 554 Pa. 293, 306, 721 A.2d 344, 351 (1998) (applying a general rule "that where a weapon cannot be specifically linked to a crime, such weapon is not admissible as evidence," to hold that a trial court had improperly admitted photographs of a capital defendant posing with nine millimeter handguns on the theory that they were relevant to the issue of the defendant's previous experience with and ownership of such handguns).[17] It also

16. Rule of Evidence 404 creates a general prohibition against the use of "other crimes, wrongs, or acts" evidence to prove character or propensity, Pa.R.E. 404(b)(1), but permits such evidence to be admitted as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity[,] absence of mistake or accident," or for other permissible purposes, Pa.R.E. 404(b)(2). Although our Rules of Evidence post-date Appellant's trial, the common law approach was essentially the same. *See Commonwealth v. Styles*, 494 Pa. 524, 525–26, 431 A.2d 978, 980 (1981); *Commonwealth v. Travaglia*, 502 Pa. 474, 492, 467 A.2d 288, 297 (1983). *See generally Commonwealth v. Burdell*, 380 Pa. 43, 47, 110 A.2d 193, 195 (1955) ("One of the most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime.").

17. The *Williams* Court relied upon *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981). However, *Coccioletti* concerned weap-

seems clear that Appellant would have been entitled to a particularized limiting instruction to protect against impermissible inferences of propensity, had one been requested by his trial counsel. *See Billa,* 521 Pa. at 179–80, 555 A.2d at 841–42. Nevertheless, Appellant fails to specifically address this Court's alternate holding on direct appeal that the admission of the evidence was harmless relative to Appellant's convictions, in light of the overwhelming evidence of Appellant's guilt, including his confession and the powerful circumstantial evidence amassed by the Commonwealth, as previously noted. Thus, the Court's prior conclusion continues to pertain, undermining Appellant's claim of prejudice.

Finally, we need not address the penalty-phase impact, in light of the PCRA court's supported decision to award a new penalty hearing on other grounds.

### F. Robbery Conviction

■■■ Appellant maintains that the Commonwealth's evidence was insufficient to support his robbery conviction, and, correspondingly, the in-perpetration-of-a-felony aggravator. The Court conducted an extensive review of this issue on direct appeal, *see Williams,* 537 Pa. at 12–17, 640 A.2d at 1256–59, which we incorporate here by reference as our disposition of this underlying claim of insufficiency and all derivative claims. *See generally Commonwealth v. Robertson,* 317 Pa.Super. 158, 164 n. 4, 463 A.2d 1133, 1136 (1983) (explaining that the existence of the requisite intent to support a robbery or felony murder conviction can be established by inferences arising from circumstances or acts committed shortly after the killing). Citing *Commonwealth v. Legg,* 491 Pa. 78, 417 A.2d 1152 (1980) (plurality), Appellant also asserts, however, that the trial court's instruction concerning robbery was flawed, as it offered no guidance concerning whether or not the underlying intent to commit a theft is formed before or

ons taken from a criminal defendant which could tend to prove that the defendant possessed the necessary means to commit the offense. *See Coccioletti,* 493 Pa. at 110, 425 A.2d at 390. By its terms, it is not relevant where, as here, most of the handguns involved were not seized from the defendant and could not have served as the murder weapon.

after the fact. However, the trial court instructed the jurors that "A person is guilty of robbery if, *in the course of committing a theft,* he inflicts serious bodily injury upon another"; moreover, it issued an accurate charge concerning the legal requirements to support the offense of theft, including the requisite intent. N.T., September 24, 1985, at 1699–1701 (emphasis added). As the Commonwealth develops, there is no requirement that the trial court indicate on any particular or additional terms that the intent to commit the theft must exist at the time the injury is inflicted. The case relied upon by Appellant to support this contention, *Legg,* does not suggest that trial courts must always do so. Rather, *Legg* faulted a trial court, presiding over a felony murder case, for having instructed the jury that "the intent to commit the felony of robbery may be found by the actor . . . either before or after the infliction of the fatal wound." *Id.* at 81, 417 A.2d at 1154. Moreover, the main opinion in *Legg* also explained that the intent to commit a felony at the time of a killing can be established by inferences arising from circumstances or acts occurring shortly afterwards. *See id.* at 82–83 & n. 4, 417 A.2d at 1154–55 & n. 4.

## G. Cumulative Effect

Finally, Appellant claims that he is entitled to relief from his conviction on account of the cumulative effect of the errors he has described. The claim is not developed in any particularized fashion, and, on our review, we find that Appellant also has failed to establish prejudice from this cumulative perspective.

The order of the PCRA court is affirmed.

Justice BAER, Justice TODD and Justice McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE (*concurring*).

I join the Majority Opinion, subject to some modest points of emphasis noted below.

First, the Majority correctly notes that recent U.S. Supreme Court cases such as *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) merely explicate, and do not themselves "establish" the "constitutional norms" governing the conduct of capital counsel in cases which were tried years, even decades, before those cases were decided. Majority Op. at 303. As this Court explained in *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 42 (2002), cases issued upon federal habeas corpus review of state convictions under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)—such as *Williams*, *Wiggins*, and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)—do not establish constitutional standards governing the performance of counsel. Instead, the Court was applying clearly established law from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), through the limiting guise of the deferential standard of review dictated by AEDPA.[1] AEDPA permits federal courts to grant state prisoners relief on federal constitutional claims that were rejected on the merits in state court only if the state court determination was contrary to, or involved an objectively unreasonable application of, then-existing, clearly established decisional law from the U.S. Supreme Court. 28 U.S.C.

1. *Strickland* did establish a governing Sixth Amendment standard, and it was a case arising on habeas corpus review of a state court conviction. However, *Strickland* was decided long before AEDPA was adopted and imposed an overdue, salutary restriction upon federal courts (at all levels) overturning decisions by state courts which reasonably interpreted governing High Court precedent. *Strickland* also was decided before the High Court recognized the impropriety of applying or innovating new rules upon habeas review of state convictions. *See Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Teague v. Lane*, 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). (Though a plurality, *Teague* has since repeatedly been embraced by the full Court. *E.g., Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 313, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)).

§ 2254(d)(1); *Wiggins*, 539 U.S. at 520–21, 123 S.Ct. 2527. *Williams* and *Wiggins* may be useful to the extent they repeat existing, governing norms established in *Strickland*, and they stand as applications of those norms. But, decisions under AEDPA do not establish any new or different constitutional law governing Sixth Amendment claims of ineffective assistance of counsel. I agree with Mr. Justice Eakin that no lawyer can be faulted for failing to abide by a rule "established" by a later case decision, much less a case decision rendered on federal collateral review.[2]

I join the Majority's substantive analysis of the penalty phase claim because the salient principles necessary to decide this matter are found in *Strickland* itself, and that case existed when counsel acted.

Second, although I join the Majority's analysis and disposition of appellant's first guilt phase claim, relating to the removal of his initial trial counsel, left to my own devices, I would reject as irrelevant appellant's reliance upon cases such as *Yohn v. Love*, 76 F.3d 508 (3d Cir.1996) and *Appel v. Horn*, 250 F.3d 203 (3d Cir.2001). These cases are non-binding expressions from lower federal court panels, and they did not exist in 1985, when appellant's trial counsel defaulted the claim concerning the pre-trial proceeding and setting of the trial date. The underlying "arguable merit" of appellant's cognizable ineffective assistance claim cannot be measured by later decisions which were non-existent when counsel acted in 1985.[3]

Third, I write to appellant's ineffectiveness claim deriving from the admission of evidence at trial concerning his ownership and theft of handguns—an evidentiary issue appellant litigated on direct appeal. The Majority does not hold the claim to be barred under the PCRA's previous litigation

2. Respectfully, I do not join footnote 6 of the Majority Opinion.

3. For similar reasons, with respect to appellant's claims arising from the timing of trial counsel's appointment and fee limitations imposed on the defense, although I again join the Majority, I would stress that appellant's reliance upon a line of cases arising from Florida concerning fee limitations, all decided after the trial in this matter, is inapposite to a contemporaneous assessment. Counsel could not have cited those cases in 1985 in support of an objection to the limitations.

provision, 42 Pa.C.S. § 9543(a)(3), because it sounds in ineffective assistance, and the Majority thereby dutifully implements the interpretation of the PCRA's previous litigation provision which prevailed in *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005).[4] I join the Majority's ultimate resolution of this claim because, as the Majority notes, this Court rendered an alternative holding, on direct appeal, that admission of the evidence was harmless. As a practical matter, that finding precludes appellant from proving *Strickland* prejudice. *Accord Commonwealth v. Collins*, 888 A.2d at 574–75; *Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 462 (2004). I would add that appellant has not shown, through citation to binding federal authority extant at the relevant time, that the new federal due process gloss he places upon the state evidentiary claim prior counsel litigated is meritorious. Finally, with respect to the tension the Majority perceives in our decisional law on the generic, underlying evidentiary issue involving prior crimes, I note that any such tension arose after the trial in this matter and therefore is of no avail to appellant, whose present claim sounds in counsel ineffectiveness.

Subject to the above, I join the Majority Opinion.

Justice EAKIN (*concurring*).

Counsel had constructive notice of appellant's mental health issues, as prior counsel's notice of intent to assert an insanity defense specifically referenced appellant's two prior psychiatric hospitalizations within seven months of his offenses. Thus

4. In *Collins*, both this author (joined by Mr. Justice Eakin) and Mr. Justice Saylor offered interpretations of the previous litigation bar which would have left more teeth in the statutory default where claims of ineffective assistance are at issue. *See* 888 A.2d at 585–86 (Castille, J., joined by Eakin, J., concurring and dissenting) (noting, *inter alia*, that many claims of ineffectiveness will fail for reasons involving issue preclusion, depending upon the basis for the resolution on direct appeal) *id.* at 584–85 (Saylor, J., concurring) (noting, *inter alia*, that the previous litigation bar should apply to claims of ineffective assistance "where the underlying claim has been fully and fairly litigated and deemed meritless, and a petitioner seeks nothing more on post-conviction review than a different and more favorable resolution of precisely the same claim that was previously rejected on direct appeal, albeit via an ineffectiveness overlay.").

relief is warranted, and I join the majority opinion. I write separately to reiterate the relevance of *Commonwealth v. Romero*, 938 A.2d 362 (Pa.2007) and address the majority's characterization of *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523 (2006).

In *Romero*, the opinion held that as Romero's trial was in 1996, well before the decisions in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), those decisions could not be the standard by which counsel's effectiveness in 1996 was measured. *Romero*, at 387. Counsel's conduct should be evaluated by the standards in effect *at the time of trial*, and if a more exacting standard is established in future cases, it is not retroactively applied. *Id.* (citing *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 51 (2002) (internal citation omitted)).

As the majority states, however, *Romero* was a plurality, and only three Justices supported the proposition that *Williams* and *Wiggins* did not apply to cases tried before their issuance; thus, it applies the general principles of those cases. *See* Majority Op., at 125–26 n. 6, 950 A.2d at 303–04 n. 6. The majority also notes *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 813–14 n. 56 (2004), relied on *Williams* and *Wiggins*. However, my position remains, consistent with *Romero* as well as the dissenting opinion filed in *Hughes*, that counsel's performance regarding mitigating evidence should be critiqued according to the law existing at the time of trial, not according to later-announced standards. *Hughes*, at 825 (Castille, J., concurring and dissenting, joined by Eakin, J.). Any other standard would require counsel to predict changes in the law and turn representation into prognostication, not counseling.

The majority also notes *Williams*' approach to the admission of evidence concerning handguns is in tension with other precedent of this Court. Majority Op., at 153, 950 A.2d at 320 (citing *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 351 (1998)). I find this statement to be overbroad. I agree with Chief Justice Castille that the tension the majority

perceives in our underlying decisional law arose after the trial in this matter, and is irrelevant to appellant's ineffectiveness claim.