J-S20027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID CELENTO | : | |
| | : | |
| Appellant | : | No. 1143 MDA 2020 |

Appeal from the Judgment of Sentence Entered March 3, 2020
In the Court of Common Pleas of Huntingdon County
Criminal Division at No(s): CP-31-CR-0000848-2018

BEFORE: NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY KING, J.:                    **FILED: AUGUST 5, 2021**

Appellant, David Celento, appeals from the judgment of sentence entered in the Huntingdon County Court of Common Pleas, following his bench trial convictions for driving under the influence of alcohol or a controlled substance ("DUI"), careless driving, operating without rear lights, failure to use a turn signal, and operating with unsafe equipment.[1] We affirm.

The trial court set forth the relevant facts of this case as follows:

> Patrolman Dustin Border of the Huntingdon Borough Police Department (HBPD) testified that in the early morning of October 28, 2018 he and Corporal David Funk were on routine patrol in the borough. At or around 1:18 AM he said, they were behind a jeep on Fourteenth Street that turned right onto Washington Street without first signaling. The officers followed the Jeep east and observed that the brake lights were not working when the vehicle slowed and stopped at stop signs. Consequently, Officer Border

---

[1] 75 Pa.C.S.A. §§ 3802(a)(1), 3714(a), 4303(b), 3334(a), and 4107(b)(2).

testified he initiated a traffic stop on the 800 block of Washington Street.

Officer Border related that he approached the Jeep and made contact with [Appellant], the operator and only person in the vehicle. At the direction of Officer Border, [Appellant] produced his registration and proof of insurance. He had difficulty finding his driver's license according to [Officer] Border but eventually produced it. Officer Border indicated he detected the odor of alcohol when [Appellant] talked, also, he said [Appellant's] eyes were bloodshot, and his speech was slurred.

[Appellant] admitted to the officer that he had been drinking that evening and admitted that he consumed three drinks.

Officer Border said he asked [Appellant] to exit his vehicle in order to perform field sobriety tests. [Appellant] agreed. Officer Border testified he utilized the Horizontal Gaze Nystagmus (HGN) test, the walk and turn test and the one leg stand test. With respect to the latter two tests the officer said he gave explicit instructions and demonstrated each test. Also, he said, at [Appellant's] request, he allowed [Appellant] to attempt to perform these two tests on a portion of sidewalk that was flatter than the surface initially selected by the officer. Nonetheless, Officer Border testified that [Appellant] did not successfully perform either test, facts which along with his observations of [Appellant] led him to the opinion that [Appellant] was impaired and incapable of safely operating a motor vehicle.

[Appellant] refused to submit to a portable breath test but requested a blood test. He was placed under arrest, handcuffed, and transported to the J.C. Blair Hospital for the test. At the hospital, the officers took [Appellant] to the registration area where Officer Border testified he filled out Commonwealth Form DL-26 and then began to read the form to [Appellant]. Almost immediately, he said, he realized he had the wrong form. He stopped reading he said and returned to the police car where he secured the correct form. After returning he indicated he asked the registration clerk to shred the first form since it contained personal information concerning [Appellant]. [Appellant], he said, became agitated and started yelling at the clerk that she

was destroying evidence. After he calmed down, Officer Border related that he read the DL-26 to [Appellant] who then asked to read the form. With the concurrence of Corporal Funk, Officer Border gave [Appellant] the form to read. After a sufficient period of time passed to read the form, [Appellant] indicated he needed his glasses, Officer Border said he retrieved the glasses, gave them to [Appellant] and then gave him sufficient time to read the DL-26. [Appellant], he said, told him he was dyslexic and a slow reader. Officer Border took the form from [Appellant] and read it, he said, verbatim a second time following which he asked [Appellant] if he would take the blood test. [Appellant], he said, responded that he would take the test after he read the DL-26. The request to take the test and the conditional response of [Appellant] was repeated multiple times until the officers concluded that the response was a refusal.

On cross-examination, Officer Border reported that [Appellant] had been argumentative and hostile throughout the process. He also explained in detail why he concluded [Appellant] failed the walk and turn and one-leg stand field tests. He was also certain that at the hospital he did not tell [Appellant] that refusing to sign the DL-26 would constitute a refusal to take the blood test. He did say that [Appellant] was asked to sign the form. He acknowledged that at all times [Appellant] said he wanted to take the test but always with the caveat that he first wanted to read the form.

Corporal Funk corroborated the testimony of Officer Border. He too expressed the opinion that [Appellant] was intoxicated and not capable of safely operating a motor vehicle. At the hearing on [Appellant's] appeal from his license suspension,[2] Corporal Funk described the conduct that led the officers to their conclusion that [Appellant] refused the test. He said:

"And finally after giving him a very reasonable amount

_____

[2] At trial, the parties agreed to incorporate into the record the transcript from a hearing held on August 13, 2019, in relation to Appellant's appeal from an order suspending his driver's license. The parties also incorporated into the record the transcript from a pre-trial hearing held on March 28, 2019.

of time that we probably didn't even have to give him legally from a legal standpoint, we started to escort him to the door.  We informed him look, you're refusing, we're done.  We gave you ample amount of time and you're not wanting to take the test.  He kept saying "I'll take the test after I read the form."  I said you had enough time to read the form.  This is your final chance.  Are you going to take the test or not?  He said "yes."  So we started walking towards the door to where we go to have blood taken and then two seconds after he said yes, he's like, "after I read the form again."  So we deemed it a refusal and we left the hospital with [Appellant]."

Ms. [Delona] Neville[3] was a witness at the license suspension appeal hearing.  Ms. Neville was the Emergency Room registration clerk at J.C. Blair Hospital on October 28, 2018.  She testified that [Appellant] was uncooperative, and hostile to her to the point where he was yelling, screaming and spitting at her.  She said he was intoxicated to the point where he had difficulty standing up and had to sit down.  She acknowledged that he verbally consented to take the blood test but added that the consent was conditioned on his reading the form.  She tagged her testimony with the observation, "I don't know how you remember anything that night to be honest."

[Appellant] testified that when he was stopped, he was very tired, nervous and anxious.  He described Officer Border as very abrupt and confusing.  He said he agreed to the field sobriety tests and that he performed the walk and turn and one-leg stand tests properly and as directed.  He agreed that he refused to take the portable breath test but told Officer Border he wanted to take the more stringent blood test.  He testified Corporal Funk was physically aggressive towards him and slammed him into the police car pinning his legs against the door.  He said he was cooperative at the hospital, and had no problem with his balance.  He was given a form to sign, he said, and told that he had to sign it in order to take the blood test.  He acknowledged that Officer Border read the DL-26 to him but said he didn't

---

[3] The record contains several different spellings of Ms. Neville's first name.

- 4 -

understand him. He related that he was given the opportunity to read the DL-26, and that the officers retrieved his glasses and gave him time to read the form again. He was adamant that the officers never told him he could take the blood test without signing the DL-26. He was equally certain he was not intoxicated.

(Opinion in Support of Denial of Post-Sentence Motions, filed August 11, 2020, at 2-6) (internal footnote and citations omitted).

Procedurally, the Commonwealth filed a criminal information on December 28, 2018, charging Appellant with DUI (general impairment, first offense) and various summary offenses. On January 31, 2019, Appellant proceeded to arraignment. Prior to arraignment, the Commonwealth had offered Appellant a chance to resolve the charges through Accelerated Rehabilitative Disposition ("ARD"). At the arraignment hearing, the District Attorney made clear:[4] "For the record…we've offered ARD. If it's not accepted today, then it's going to be withdrawn." (N.T. Arraignment, 1/31/19, at 1). Appellant rejected the Commonwealth's ARD offer.

Appellant filed a pre-trial motion to dismiss on February 25, 2019. Appellant argued the police prevented him from obtaining "exculpatory evidence" in the form of a blood test where the police did not permit Appellant to undergo the blood test once Appellant finished reading the form. (Pre-Trial Motion, filed 2/25/19, at 2). Following a hearing on March 28, 2019, the court

_____

[4] District Attorney David Smith represented the Commonwealth at this proceeding and in other proceedings until trial.

denied relief.[5]

Around November 2019, Appellant asked trial counsel if ARD was still an option. When trial counsel asked the District Attorney if Appellant was still eligible for ARD, the District Attorney said no. Appellant proceeded to a bench trial on December 17, 2019, after which the court convicted Appellant of DUI, careless driving, operating without rear lights, failure to use a turn signal, and operating with unsafe equipment. The court sentenced Appellant on March 3, 2020, to six months' probation for DUI, and imposed fines for the summary offenses.

On March 12, 2020, new counsel entered an appearance on behalf of Appellant and timely filed a post-sentence motion. In his motion, Appellant alleged, *inter alia*: (1) trial counsel was ineffective for failing to challenge the District Attorney's rejection of Appellant's fall 2019 request to be admitted into ARD; (2) that in cases where an individual is denied admission into ARD, the relevant offense should not be deemed a petty offense for purposes of the Sixth Amendment right to a jury trial; and (3) the verdict was against the weight of the evidence. (Post-Sentence Motions, filed 3/12/20, at 2, unpaginated). On April 28, 2020, Appellant requested an extension of time

---

[5] The Honorable George N. Zanic presided over the pre-trial hearing. At the conclusion of the hearing, Judge Zanic recused himself due to his belief that Appellant's testimony at the hearing was completely incredible. Thus, Judge Zanic assigned the Honorable Stewart L. Kurtz to preside over Appellant's trial.

for the court to rule on the motion, which the court granted.[6]

The court held a hearing on the post-sentence motion on June 1, 2020. At the hearing, Appellant said he was pursuing "the constitutionality of [Appellant] being able to pursue a jury trial without ARD," which Appellant said did not require any testimony, as well as trial counsel's failure "to request an ARD motion after [Appellant] was denied when he basically later determined that he would like to proceed to ARD." (N.T. Post-Sentence Motion Hearing, 6/1/20, at 1-2; R.R. at 120a-121a). The court then had the following exchange with the parties:

THE COURT: Well, factually you alleged that initially [Appellant] was offered ARD. Is that a correct statement?

[DEFENSE COUNSEL]: That is correct, Your Honor.

THE COURT: And he refused it.

[DEFENSE COUNSEL]: At first, Your Honor, he did.

THE COURT: At first. And then subsequent requests were denied by the District Attorney's Office, is that correct?

[DEFENSE COUNSEL]: That's correct.

THE COURT: [Assistant District Attorney ("ADA")], you agree with that?

_____

[6] Generally, the trial court has 120 days to rule on post-sentence motions or they are deemed denied by operation of law. *See* Pa.R.Crim.P. 720(B)(3)(a). Upon motion of the defendant for good cause shown, however, the trial court may grant one 30-day extension for decision on the motion. *See* Pa.R.Crim.P. 720(B)(3)(b).

> [ADA]:                    Yes, Your Honor.
>
> THE COURT:                And let me ask, [ADA], do you have a policy with respect to this situation?
>
> [ADA]:                    Yes, Your Honor.  We offered ARD early on in this case and I have a note in the file that [Appellant] rejected that on January 30th of 2019 and based upon that rejection we would not subsequently offer ARD.
> …

(*Id.* at 2; R.R. at 121a).

To pursue his ineffectiveness claim in this proceeding, Appellant expressly waived his right to challenge trial counsel's effectiveness through a petition pursuant to the Post Conviction Relief Act ("PCRA").  (*Id.* at 10; R.R. at 129a).  Appellant stressed that by virtue of his short probationary sentence of six months, he would likely be unable to litigate his ineffectiveness claim in collateral proceedings, even if the trial court stayed his probationary sentence pending appeal.  (*Id.* at 7; R.R. at 126a).  Thereafter, the court permitted Appellant to develop the record with his ineffectiveness claim.  (*Id.*)

Trial counsel testified in relevant part as follows (*see id.* at 3-6, 10-15; R.R. at 122a-125a, 129a-134a): Trial counsel was appointed to represent Appellant in November 2018.  Around the time of Appellant's preliminary hearing, trial counsel and the District Attorney tentatively discussed ARD because Appellant had no prior convictions and trial counsel believed Appellant would qualify for the program.  In January 2019, the District Attorney made a formal offer of ARD to Appellant.  Trial counsel specifically recalled discussing the advantages and disadvantages of ARD with Appellant at that time.

Appellant rejected the ARD offer because he wanted to put on the record the conduct of the police officers involved in his arrest and wanted to testify in his own defense. Trial counsel "strongly encourag[ed]" Appellant to rethink his decision to reject ARD, but Appellant was firm in his choice.

After Appellant officially rejected the ARD offer, sometime around November 2019, Appellant asked trial counsel if ARD was still an option. Trial counsel subsequently contacted the District Attorney at least once, but possibly more than once, asking if ARD was still an option for Appellant, but the District Attorney said it was not. Trial counsel did not file a formal motion for reconsideration because counsel thought it would have been futile to do so, as ARD is generally discretionary within the District Attorney's Office, absent any improper motive or abuse of discretion. Trial counsel had filed a similar motion in the past in a different case and was unsuccessful. Nothing in the proceedings demonstrated to trial counsel any improper motive or abuse of discretion in denying Appellant admission to ARD when Appellant had initially rejected the ARD offer. Trial counsel confirmed that Appellant made his belated request for ARD after he had unsuccessfully litigated pre-trial motions.

Appellant testified in relevant part as follows (*see id.* at 15-26; R.R. at 134a-145a): Appellant recalled trial counsel discussing ARD with him. Appellant had a "brief sketch" of the advantages and disadvantages of ARD but it was "very vague" in terms of Appellant's understanding. Appellant was

under the impression that if he engaged in ARD it would eliminate the need to go to trial but Appellant was unsure if ARD meant he would be admitting some form of guilt, which Appellant did not want to do. Appellant was "deeply concerned" about the conduct of the officers with regard to their interference of Appellant's right to have a blood draw.

Later on in the proceedings, when Appellant had a "deeper understanding" of what ARD entailed, he wanted to pursue it. Trial counsel explained to Appellant that the District Attorney turned down his request for ARD because Appellant had already rejected the initial offer. Appellant described the District Attorney's initial ARD offer as "take it or leave it," which occurred before Appellant had an opportunity to discuss the benefits of ARD with trial counsel at length. In that moment, Appellant rejected the offer because he wanted to make "the conduct of the officers a formal record." Appellant agreed that the District Attorney made the initial ARD offer prior to litigation of pre-trial motions. Appellant admitted that trial counsel asked the District Attorney to reconsider Appellant's admission into ARD twice after Appellant had initially rejected the offer.

Appellant insisted he suffers from dyslexia and auditory interpretation, especially under "duress." Appellant conceded that he has not been formally diagnosed with those illnesses. Appellant admitted he only received educational learning support to address these difficulties in elementary school. Over Appellant's initial objection to answering, Appellant confirmed he has a

- 10 -

bachelor's degree in architecture from Carnegie Mellon and a graduate degree from the Graduate School of Design at Harvard University. At the conclusion of the hearing, the court deferred its ruling pending the submission of post-hearing briefs.

On August 11, 2020, the court denied relief. Appellant timely appealed on September 8, 2020.[7] On September 16, 2020, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely filed his Rule 1925(b) statement on October 9, 2020.

Appellant raises the following issues for our review:

> In a case where the district attorney has denied a defendant's admission into ARD, is the right to a trial by jury applicable?

---

[7] Because the court granted a 30-day extension per Rule 720(B)(3)(b), the court's ruling on the motion was due by Monday, August 10, 2020. As the court did not rule on the motion by that date, the clerk of courts should have entered an order deeming the motion denied by operation of law. **See** Pa.R.Crim.P. 720(B)(3)(b) (stating if judge fails to decide motion within 30-day extension period, motion shall be deemed denied by operation of law); Pa.R.Crim.P. 720(B)(3)(c) (explaining when post-sentence motion is deemed denied by operation of law, clerk of courts shall enter order deeming motion denied on behalf of trial court and serve copies on parties). Here, a breakdown in the operations of the court occurred where the clerk of courts failed to enter the order deeming the post-sentence motions denied by operation of law on August 10, 2020. **See Commonwealth v. Patterson**, 940 A.2d 493 (Pa.Super. 2007), *appeal denied*, 599 Pa. 691, 960 A.2d 838 (2008) (explaining court's failure to comply with Rule 720 constitutes breakdown in operations of court). In any event, Appellant filed his notice of appeal on September 8, 2020, within 30 days of the date on which the clerk of courts should have deemed the post-sentence motion denied by operation of law. Under these circumstances, we will overlook any procedural irregularity with the appeal.

In a case where the prosecution disparages the defendant's race and gender in a closing argument, is there sufficient proof to determine that the failure to grant ARD was an abuse of discretion and related to the consideration of inappropriate criteria?

Did trial counsel render ineffective assistance?

Was the verdict against the weight of the evidence?

(Appellant's Brief at 9).

In his first issue, Appellant argues that he should have been entitled to a jury trial for his DUI offense. Appellant acknowledges the presumption that offenses punishable by no more than six months are considered "petty offenses." Appellant claims that presumption can be rebutted, however, by examining the objective indications of the seriousness with which society regards the offense. Appellant insists DUI is a serious crime, in which drunk drivers have claimed and injured thousands of lives. Appellant maintains that DUI should not be considered a "petty offense" for purposes of deciding whether the right to a jury trial attaches. Appellant also concedes that DUI cases which are submitted for resolution through ARD are, by definition, "petty." Appellant submits that because the District Attorney denied his admission to ARD, that means the Commonwealth must have decided his offense was not minor. Appellant concludes he was entitled to a jury trial under these circumstances, and this Court must grant appropriate relief. We disagree.

"[B]oth the U.S. Constitution and Article I, Section 9 of the Pennsylvania

Constitution only guarantee a defendant a right to a jury trial for 'serious offenses,' or crimes which carry more than a six month maximum prison sentence." ***Commonwealth v. Langley***, 145 A.3d 757, 760 (Pa.Super. 2016). "In contrast, crimes that carry a maximum of six months' imprisonment or less are considered 'petty offenses' for which there is no right to a jury trial." ***Id.***

This Court has explained:

> "The test is clear. The decisions of the Supreme Court of the United States 'have established a fixed dividing line between petty and serious offenses: those crimes carrying [a sentence of] more than six months are serious [crimes] and those carrying [a sentence of six months or] less are petty crimes.'" ***Commonwealth v. Mayberry***, 459 Pa. 91, 98, 327 A.2d 86, 89 (1974) (quoting ***Codispoti v. Pennsylvania***, 418 U.S. 506, 512, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974)). It is well-settled that a legislature's determination that an offense carries a maximum prison term of six months or less indicates its view that an offense is "petty." ***Blanton v. North Las Vegas***, 489 U.S. 538, 543, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989). As further explained in ***Blanton***,
>
>> It has long been settled that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision. In determining whether a particular offense should be categorized as petty, our early decisions focused on the nature of the offense and on whether it was triable by a jury at common law. In recent years, however, we have sought more objective indications of the seriousness with which society regards the offense. **[W]e have found the most relevant such criteria in the severity of the maximum authorized penalty. In fixing the maximum penalty for a crime, a legislature include[s] within the definition of the crime itself a judgment about the seriousness of the offense. The judiciary should not substitute**

- 13 -

> **its judgment as to seriousness for that of a legislature, which is far better equipped to perform the task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect**.
>
> *Id.* at 541–542, 109 S.Ct. 1289 (internal quotation marks and citations omitted).

*Commonwealth v. Kerry*, 906 A.2d 1237, 1239 (Pa.Super. 2006) (emphasis added). "[B]y setting the maximum authorized prison term at six months, the Legislature categorized the violation of [Section] 3802(a)(1) as petty for purposes of a defendant's jury trial rights." *Langley, supra* at 761 (rejecting appellant's claim that DUI should be considered serious offense for purposes of whether right to jury trial attaches).

Instantly, Appellant's current DUI was his first DUI offense for which he faced a maximum term of six months' imprisonment. *See* 75 Pa.C.S.A. 3803(a)(1) (explaining individual who violates section 3802(a) (relating to DUI) and has no more than one prior offense commits misdemeanor for which individual may be sentenced to term of imprisonment of not more than six months and to pay fine under section 3804 (relating to penalties)). The legislature's decision to fix the maximum term of imprisonment at six months evidences its judgment that DUI as a first offense is not a "serious" offense. *See Langley, supra*. We reject Appellant's invitation to substitute our judgment regarding the seriousness of DUI for that of our legislature. *See Blanton, supra*; *Langley, supra*; *Kerry, supra*. Consequently, Appellant's

first issue merits no relief.

In his second issue, Appellant argues the Commonwealth rejected his admission into ARD based on improper factors. Appellant emphasizes the prosecutor's statements at closing argument that "it seems like we have a very entitled person. He is an embodiment of everything wrong with the white male America. When we hear the word white privilege, this is what I think of." (Appellant's Brief at 21) (citing N.T. Trial, 12/17/19, at 114). Appellant claims the prosecutor's remarks make clear the Commonwealth did not permit Appellant access to ARD based on his race and gender. Although Appellant acknowledges the Commonwealth's alleged policy to deny defendants into ARD if they have previously rejected an ARD offer, Appellant contends that it is "impossible to purge the taint of discrimination in this case" to discern the true reason for denying Appellant access to ARD. (Appellant's Brief at 21). Appellant concludes the District Attorney's denial of his admission into ARD was improper, and this Court must grant appropriate relief. We disagree.

Chapter 3 of the Pennsylvania Rules of Criminal Procedure governs the procedure for ARD in court cases and summary cases. The explanatory comment to this chapter provides, in relevant part:

> The primary purpose of this program is the rehabilitation of the offender; **secondarily, the purpose is the prompt disposition of charges, eliminating the need for costly and time-consuming trials or other court proceedings**. These rules contemplate that ordinarily the defendants eligible for the ARD program are first offenders who lend themselves to treatment and rehabilitation rather than punishment and that the crime charged is relatively minor

and does not involve a serious breach of the public trust. The program is intended to encourage offenders to make a fresh start after participation in a rehabilitative program and offers them the possibility of a clean record if they successfully complete the program. Because of the rehabilitative purpose of the program, and because the program permits prompt disposition of the charges, the descriptive title "accelerated rehabilitative disposition" was selected rather than such terms as "pre-indictment probation" or "deferred disposition."

The rules in this Chapter provide the procedural framework for the utilization of Accelerated Rehabilitative Disposition by the judges of the courts of common pleas in court cases and in summary cases, and by the minor judiciary in summary cases. These rules do not specify those classes of offenses or offenders that are eligible or ineligible for inclusion in the ARD program. **In general, the district attorney has the responsibility for determining which cases will be recommended for entry into the ARD program**.

\* \* \*

Pa.R.Crim.P. Ch 3, *Explanatory Comment* (emphasis added).

"After criminal proceedings in a court case have been instituted, the attorney for the Commonwealth may move, before a judge empowered to try court cases, that the case be considered for [ARD]." Pa.R.Crim.P. 310. "A request for inclusion into the program may be made to the district attorney by the defendant, the defendant's attorney, or an interested agency or institution." *Id.*, *Comment*.

This Court has made clear:

The decision to submit a case for ARD rests in the sound discretion of the district attorney, **and absent an abuse of that discretion involving some criteria for admission to ARD wholly, patently and without doubt unrelated**

- 16 -

> **to the protection of society or the likelihood of a person's success in rehabilitation, such as race, religion or other such obviously prohibited considerations**, the attorney for the Commonwealth must be free to submit it for ARD consideration based on his view of what is most beneficial for society and the offender. A district attorney may base a decision to grant or deny admission to ARD on any consideration related to the protection of society and the rehabilitation of the defendant. In effect, the trial court must determine the evidence was insufficient to support a finding that the district attorney's decision was related to the protection of society or the likelihood of success in rehabilitating the defendant. … The Commonwealth does not have the burden of proving the absence of abuse of discretion; **rather, the petitioner has the burden of proving the Commonwealth's denial of his request was based on prohibited reasons**. Admission into the ARD program is intentionally restrictive to ensure the district attorney makes the decision to suspend prosecution pending the successful completion of the ARD program. If the district attorney based his decision upon criteria related to the protection of society or the likelihood of a person's success in rehabilitation, then the district attorney's decision will stand.

*Commonwealth v. Sohnleitner*, 884 A.2d 307, 313-14 (Pa.Super. 2005) (emphasis added), *appeal denied*, 587 Pa. 692, 897 A.2d 456 (2006) (internal citations and quotation marks omitted). "Upon the Commonwealth's denial of a defendant's admission into an ARD program, the trial court's role is limited to whether the Commonwealth abused its discretion." *Id.* at 313.

"A defendant's inclusion into an ARD program is a joint effort between the prosecutor and the trial court. An ARD recommendation is solely in the province of the prosecutor, and admission of an offender into the program is by the grace of the trial court upon the Commonwealth's motion." *Commonwealth v. Pypiak*, 728 A.2d 970, 972 (Pa.Super. 1999).

- 17 -

Additionally, "[a] prosecutor has full discretion to reject a defendant for ARD and need not supply reasons for the decision to reject the defendant." **Id.** Even when it is unclear from the record what general policy the District Attorney employs when admitting or denying a defendant to ARD, it is still the petitioner's burden to establish that the District Attorney's denial of an ARD request was based on prohibited reasons. **Id.** Furthermore, the Commonwealth is entitled to withdraw its ARD recommendation at any point before the trial court rules on it. **Commonwealth v. Cline**, 800 A.2d 978, 982 (Pa.Super. 2002), *appeal denied*, 573 Pa. 676, 822 A.2d 703 (2003).

Instantly, the Commonwealth made an informal offer of ARD to Appellant early in the proceedings, sometime prior to arraignment. Although trial counsel "strongly encouraged" Appellant to accept the offer, Appellant made clear he wanted to reject it, so Appellant could make a record of the alleged police misconduct in his case. The Commonwealth formally offered ARD to Appellant at arraignment on January 31, 2019. District Attorney Smith made clear: "For the record…we've offered ARD. If it's not accepted today, then it's going to be withdrawn." (N.T. Arraignment, 1/31/19, at 1). Appellant rejected the Commonwealth's ARD offer.

Consistent with Appellant's intent to challenge the conduct of the police, Appellant subsequently filed a motion to dismiss on February 25, 2019, which the court heard on March 28, 2019. Following the pre-trial hearing, the court denied relief. Around November 2019, approximately ten months after

Appellant had rejected the Commonwealth's ARD offer, Appellant asked trial counsel to inquire if ARD was still an option. Despite trial counsel's efforts, the Commonwealth declined to reinstate the ARD offer.

In support of his claim that the District Attorney rejected Appellant's admission to ARD based on improper factors, Appellant highlights the prosecutor's closing argument at trial:[8]

> Just very briefly, a couple things that struck me during this case and my review of the record in this case was that everything that has happened here according to [Appellant] is someone else's fault. We have the faulty inspection of the vehicle that caused him to be pulled over. The officer is talking too fast. He is being roughed up by the officers.
>
> Your Honor, I prosecuted I don't even know how many DUI cases in the past 15 years or so, and I don't know that I have ever encountered conduct quite like this. In looking at this, it seems like we have a very entitled person. He is an embodiment of everything wrong with the white male America. When we hear the word white privilege, this is what I think of. Your Honor, everything here is someone else's fault. Poor [Appellant].
>
> I think we have proved beyond a reasonable doubt that he was under the influence and he was incapable of safe driving, and I think the refusal has been previously ruled on. I would just ask that he be found guilty of the charges that are lodged against him.

(N.T. Trial at 113-14; R.R. at 116a-117a).

Notwithstanding the mention of Appellant's race and sex in the prosecutor's closing remarks, we cannot agree with Appellant that his denial

---

[8] Assistant District Attorney Julia Wilt represented the Commonwealth at trial.

of admission into ARD was "wholly, patently and without doubt" based on prohibited considerations. *See Sohnleitner, supra*. Notably, the prosecutor who made those comments was uninvolved in the case prior to trial, and was not the same attorney who had made the offer of ARD at arraignment.

Further, the record demonstrates that the District Attorney's office had a policy of offering ARD to qualifying defendants early in the proceedings, and not reinstating an ARD offer after a defendant initially rejected it. (*See* N.T. Post-Sentence Motion Hearing at 2; R.R. at 121a). Such a policy is consistent with the secondary purpose of ARD to eliminate the need for costly and time-consuming trials or other court proceedings. *See* Pa.R.Crim.P. Ch 3, *Explanatory Comment*. Here, Appellant chose to reject ARD to see if he would succeed in having the case completely dismissed. Only when Appellant failed in that endeavor did he decide to pursue ARD. On this record, Appellant has failed to satisfy his burden to prove that the District Attorney's denial of his belated request for ARD was based on prohibited considerations. *See Sohnleitner, supra*; *Cline, supra*; *Pypiak, supra*. Therefore, Appellant's second issue merits no relief.

In his third issue, Appellant argues trial counsel was ineffective for failing to file a motion in the trial court challenging the Commonwealth's refusal to accept Appellant's reconsideration of the initial ARD offer, particularly in light of the Commonwealth's discriminatory statements during closing argument. Appellant acknowledges the general rule that claims of

ineffective assistance of counsel are ordinarily deferred until collateral review. Nevertheless, Appellant submits that his claim of ineffectiveness is ripe for appellate review because he raised the claim before the trial court in his post-sentence motion, developed the record regarding this claim at the hearing on his post-sentence motion, and waived his right to collateral review on the record.

On the merits, Appellant claims trial counsel had no reasonable basis for failing to request the trial court to review the District Attorney's denial of ARD. Appellant highlights trial counsel's testimony that he did not file such a motion on Appellant's behalf because he had been unsuccessful in filing a similar motion in another case. Given the evidence of bias displayed during closing arguments, Appellant insists there was no valid defense strategy for declining to file such a motion in this case. Appellant contends counsel's inaction caused him prejudice. Appellant further claims trial counsel was ineffective for failing to object to the unavailability of a jury trial. Appellant concludes counsel rendered ineffective assistance, and this Court must grant appropriate relief. We disagree.

Ineffective assistance of counsel claims are generally reserved for collateral review. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). In *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004), our Supreme Court determined that an ineffectiveness claim might be raised on

direct appeal if: (1) the appellant raised his claim(s) in a post-sentence motion; (2) an evidentiary hearing was held on the claim(s); and (3) a record devoted to the claim(s) has been developed.

The Supreme Court limited its holding in **Bomar** in **Commonwealth v. Holmes**, 621 Pa. 595, 79 A.3d 562 (2013). In **Holmes**, the Court reiterated the general rule in **Grant** that claims of ineffective assistance of counsel must be deferred until collateral review. Nevertheless, the Court recognized two exceptions to the general rule, both falling within the discretion of the trial judge:

> First, we appreciate that there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and we hold that trial courts retain their discretion to entertain such claims. …
>
> Second, with respect to other cases and claims such as **Bomar** and the matter *sub judice*, where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown,[1] and (2) the unitary review so indulged is preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA.[2] In other words, we adopt a paradigm whereby unitary review may be available in such cases only to the extent that it advances (and exhausts) PCRA review in time; unlike the so-called **Bomar** exception; unitary review would not be made available as an accelerated, extra round of collateral attack as of right. …

<sup></sup>1 [I]n short sentence cases the trial court's assessment of good cause should pay particular attention to the length of the sentence imposed and the effect the length of the sentence will have on the defendant's realistic prospect to be able to avail himself of collateral review under the PCRA.

2 Unitary review describes the defendant's ability to pursue both preserved direct review claims and collateral claims of trial counsel ineffectiveness on post-sentence motions and direct appeal, and could aptly describe both exceptions we recognize today. However, for purposes of this appeal, we intend the term only to describe the second exception, *i.e.*, that hybrid review which would encompass full-blown litigation of collateral claims (including non-record-based claims).

*Id.* at 599, 79 A.3d at 564. Specifically, regarding short sentence cases, the Court stated: "We trust that trial courts, in short sentence cases where a request is made to litigate collateral claims in the post-verdict scenario, will recognize these practical concerns and liberally allow for unitary review." *Id.* at 623, 79 A.3d at 578. *See also* 42 Pa.C.S.A. § 9543(a)(1)(i) (requiring that PCRA petitioner currently be serving sentence of imprisonment, probation or parole for crime at issue to be eligible for PCRA relief).

Instantly, Appellant raised in his post-sentence motion trial counsel's ineffectiveness for failing to challenge the District Attorney's denial of ARD. The court scheduled a hearing on the motion for June 1, 2020. At that hearing, Appellant acknowledged that he was serving a short sentence of only six months' probation and would be unlikely to litigate his ineffectiveness claims on collateral review prior to completing his probationary sentence.

Additionally, Appellant expressly waived his right to PCRA review. Based on Appellant's waiver, the court permitted Appellant to develop his ineffectiveness claim on the record. Under these circumstances, we will reach the merits of this ineffectiveness claim on direct appeal.[9] **See Holmes, supra**.

Pennsylvania law presumes counsel has rendered effective assistance. **Commonwealth v. Williams**, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. **Commonwealth v. Kimball**, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. **Williams, supra**.

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit…." **Commonwealth v. Pierce**, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be

---

[9] Appellant did not raise in his post-sentence motion or develop during the post-sentence motion hearing his claim on appeal that trial counsel was ineffective for failing to object to the unavailability of a jury trial. Therefore, we will not consider this ineffectiveness claim on appeal as it runs afoul of **Holmes**.

found ineffective for failing to pursue a baseless or meritless claim."

***Commonwealth v. Poplawski***, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

***Pierce, supra*** at 524, 645 A.2d at 194-95 (internal citations omitted).

> Prejudice is established when [an appellant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The [appellant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. …

***Commonwealth v. Chambers***, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002)

(some internal citations and quotation marks omitted).

Here, trial counsel testified at the post-sentence motion hearing that he did not file a formal motion with the trial court seeking to challenge the District Attorney's rejection of Appellant for ARD due to counsel's knowledge of the District Attorney's broad discretion regarding ARD, and where counsel did not discern any improper basis by the District Attorney in that decision. Additionally, trial counsel indicated that he had been unsuccessful in another case when he made a similar challenge. Although Appellant again points to the prosecutor's remarks at closing argument, those comments had not yet occurred at the time trial counsel would have sought to challenge the District

Attorney's rejection of Appellant's late request for ARD. Under these circumstances, trial counsel's decision not to file a motion challenging Appellant's exclusion from ARD was reasonable. **See Pierce, supra**. Therefore, Appellant's third issue merits no relief.

In his fourth issue, Appellant argues there was no evidence that he operated his motor vehicle in an unsafe manner. Appellant asserts that Officer Border pulled him over for malfunctioning brake lights and Appellant's alleged failure to signal a right turn. Appellant emphasizes the officer's testimony that Appellant slowed down and stopped at stop signs. Appellant insists there was no evidence that he failed to stop, stopped in a delayed manner, wove, sped, or drove too slowly. Appellant insists it "shocks the conscience" to conclude he was incapable of safe driving when all accounts of the actual operation of the motor vehicle demonstrate Appellant was operating his vehicle in a safe fashion. Appellant concludes the verdict was against the weight of the evidence, and this Court must grant appropriate relief. We disagree.

When examining a challenge to the weight of the evidence, our standard of review is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the

underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Champney***, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (internal citations omitted). A "trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Rivera***, 603 Pa. 340, 363, 983 A.2d 1211, 1225 (2009), *cert. denied*, 560 U.S. 909, 130 S.Ct. 3282, 176 L.Ed.2d 1191 (2010).

Instantly, the Commonwealth presented testimony from Officer Border and Corporal Funk at trial. The police officers testified in relevant part as follows: (1) Officer Border initially stopped Appellant for failing to use a turn signal and brake lights that were not working; (2) Officer Border smelled the odor of intoxicating beverage coming from Appellant's vehicle and his person; (3) Appellant fumbled through his wallet to produce his driver's license; (4) Appellant admitted to consuming alcohol that evening; (5) Appellant's eyes were bloodshot, he had slurred speech when answering questions, and was being somewhat hostile with the officers; specifically, Appellant claimed the reason for the traffic stop had nothing to do with his driving and the inspection station should be at fault because Appellant said he had just taken the car for inspection earlier that day; (6) Appellant failed all field sobriety tests including the HGN test, walk and turn, and one leg stand; (7) Appellant refused to take a portable breath test and insisted on a blood draw; (8) Officer Border arrested

Appellant for DUI; (9) Appellant refused to get into the patrol car after multiple requests, such that Corporal Funk had to physically place Appellant into the car; (10) at the hospital, Officer Border initially read the incorrect DL-26 form to Appellant; when the officer realized his error and asked the hospital registration clerk to shred the paper, which had Appellant's identifying information on it, Appellant yelled at the registration clerk that she was destroying evidence; (11) when the officer obtained the correct DL-26 form to read to Appellant, Appellant asked to read the form himself; the officers permitted Appellant to do so; (12) Appellant made numerous statements that he would not undergo the blood draw until he read the DL-26 form, and repeatedly claimed he was not finished reading the form after the officers had given him ample time to do so; (13) in Corporal Funk's opinion, Appellant was "stonewalling." (*See* N.T. Trial at 1-72; R.R. at 4a-75a).

Appellant testified in his own defense in relevant part as follows: (1) when Officer Border pulled over Appellant's vehicle, Appellant informed the officer that he had purchased the vehicle earlier that day and Appellant was not used to driving it; (2) Appellant admitted he consumed two or three drinks over a three hour period; (3) Appellant placed blame for the vehicle's performance issues on the entity that had conducted an inspection of the vehicle earlier that day; (4) Appellant insisted he passed the one-leg stand once the officer permitted him to perform it on flat ground; (5) Appellant said he completed the walk-and-turn test as instructed; (6) to the extent Appellant

failed the HGN test, Appellant suggested his dyslexia might have been responsible for that failure; (7) Appellant insisted on a blood draw instead of a portable breath test because Appellant believed the results of a blood draw were more reliable; (8) when Appellant requested a blood draw, Corporal Funk became enraged and grabbed Appellant roughly; (9) although Appellant did not refuse to get into the patrol car, Corporal Funk pinned Appellant's legs against the door sill and yelled at him to cooperate; (10) at the hospital, the officers presented Appellant with a form that Appellant believed he needed to sign before taking the blood test; (11) when the officers initially read Appellant the incorrect form, Appellant asked the registration clerk not to shred it because it could be evidence; (12) when Officer Border produced the correct form and began reading it to Appellant, Appellant's dyslexia interfered with his ability to process the words; (13) Appellant asked to read the form and the officers permitted him to do so; (14) the officers were dissatisfied with how long it was taking Appellant to read the form and kept pressuring him to read faster; (15) neither officer informed Appellant that he could take the blood test without signing the form. (**See id.** at 76-109; R.R. at 79a-112a).

The parties also incorporated into the record transcripts from two earlier proceedings.[10] The pre-trial hearing transcript from March 28, 2019 included testimony from the hospital registration clerk, Ms. Delona Neville. Ms. Neville

_____

[10] The transcript from Appellant's license suspension appeal is not in the certified record.

testified in relevant part as follows: (1) she was working as an emergency room registration clerk on the date in question; (2) when the officers asked Ms. Neville to shred the incorrect DL-26 form, Appellant became hostile and was "spitting at [Ms. Neville] through the window"; (3) Appellant became "violent" when he believed the officers were shredding evidence; (4) Ms. Neville was nervous due to Appellant's behavior; (5) Ms. Neville heard the officers read Appellant the correct DL-26 form several times; (6) the officers gave Appellant plenty of opportunities to read the form, but after Appellant's repeated refusals not to take the blood test until after reading the form, the officers and Appellant left. (*See* N.T. Pre-Trial Hearing, 3/28/19, at 31-39).[11]

In rejecting Appellant's weight claim, the trial court stated: "[T]wo police officers and a hospital registration clerk gave credible evidence that [Appellant] was under the influence of alcohol early in the morning of October 28, 2020. No credible evidence refuted this proof. Clearly there is nothing shocking about the verdict." (Opinion in Support of Denial of Post-Sentence Motions at 8-9). The court was free to reject Appellant's testimony and credit the testimony of the Commonwealth's witnesses. *See Champney, supra*. On this record, we see no reason to disrupt the court's ruling on Appellant's weight claim. *See id. See also Rivera, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

_____

[11] The transcript from the March 28, 2019 hearing is included in the certified record but not in the reproduced record.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/05/2021